US WEST COMMUNICATIONS, INC., A Colorado Corporation; US West, Inc., A Colorado Corporation; and US West Real Estate, Inc., A Colorado Corporation, Appellants,

v.

OFFICE OF CONSUMER ADVOCATE, Appellee,

and

Thomas N. Locke, Intervenor–Appellee.

No. 92–403.

Supreme Court of Iowa.

April 21, 1993.

George A. Carroll of US West Communications, Inc., Des Moines, for appellants.

James R. Maret, David R. Conn, and Alice J. Hyde, Des Moines, for appellee Office of Consumer Advocate.

Jacqueline Stetson Rypma and Jeanne K. Johnson, Des Moines, for intervenor-appellee Locke.

Considered by McGIVERIN, C.J., and SCHULTZ, CARTER, NEUMAN, and SNELL, JJ.

SCHULTZ, Justice.

The issue in this appeal is whether copies of lease and real estate transactions, which were provided to the Office of Consumer Advocate (OCA) by a utility company in a rate proceeding, are exempt from disclosure under our public records law, Iowa Code chapter 22.[1] Thomas A. Locke, the intervenor, is a newswriter who demanded the release of the information. US West, Inc. (West) owns US West Communications, Inc. (USWC) and US West Real Estate, Inc. (REI). These three companies commenced this action to enjoin the OCA from disclosing the lease information. We hold the trial court correctly refused to grant the injunction and affirm.

In 1991, the Denver Business Journal published a series of articles, written by Locke and others, relating to West's sales of commercial real estate and leasebacks of commercial space to its subsidiaries. According to the articles, West and its subsidiaries are paying inflated lease rates to each other to help drive up the costs of its buildings that are for sale and prevent a loss at the expense of shareholders. The inflated lease rates are then passed along to increase ratepayers' costs.

In February 1992, during a pending rate proceeding, the OCA instituted an investigation to determine the reasonableness of USWC's rates and charges. The OCA filed data requests asking for the book values of six of West's buildings. OCA wanted to know who previously owned the buildings, who bought them, and how much rent per square foot USWC was paying its affiliate, REI. USWC provided the requested information under an agreement of confidentiality. This agreement provided that OCA would not release the information until West had an opportunity to litigate the question of whether the information met an exception to disclosure.

This action was tried in equity; therefore, our review is de novo. We review the facts and the law and decide the matter anew. *Schnabel v. Display Sign Service, Inc.*, 219 N.W.2d 546, 549 (Iowa 1974). When statutes are construed, our review is at law.

Iowa Code chapter 22 generally grants the public the right for examination and dissemination of public records. The definition of public records is found in Iowa Code section 22.1 and includes "all records, documents stored or preserved in any medium, of or belonging to this state...." Iowa Code section 22.2 provides for public access to examine and copy public records. In seeking an injunction, West and its subsidiaries relied on two exceptions to disclosure provided in Iowa Code section 22.7:

3. Trade secrets which are recognized and protected as such by law.

. . . . .

6. Reports to government agencies which, if released, would give advantage to competitors and serve no public purpose ...

■ The purpose of chapter 22 is to remedy unnecessary secrecy in conducting the public's business. *City of Dubuque v. Telegraph Herald, Inc.*, 297 N.W.2d 523, 527 (Iowa 1980). We have interpreted our public records law to impose a presumption in favor of disclosure and to give a narrow interpretation to statutory exemptions from disclosure. *Board of Directors of Davenport Community School Dist. v. Quad City Times*, 382 N.W.2d 80, 82 (Iowa 1986); *City of Dubuque*, 297 N.W.2d at 526–27. "Disclosure is favored over nondisclosure, and exemptions from disclosure are to be strictly construed and granted sparingly." *Davenport Community School Dist.*, 382 N.W.2d at 82.

---

1. All references are to the 1991 Iowa Code unless otherwise noted.

■ I. *Trade secrets.* We must first determine whether leases, purchases or sales agreements found in the unregulated real estate division of West's files, divulged to OCA during a rate proceeding, may be properly characterized as "trade secrets" under section 22.7(3). Our review requires an examination of the legal principles employed and the facts de novo.

While section 22.7(3) exempts "trade secrets" from disclosure, chapter 22 does not define the term. However, all parties agree that the definition contained in the Uniform Trade Secrets Act, Iowa Code section 550.2(4) (Supp.1991), is controlling. Consequently, we need not consider the meanings of "trade secrets" derived from our case law in effect at the time chapter 22 was enacted. Section 550.2(4) provides:

"*Trade secret*" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Our first inquiry is whether the statutory term "information" includes the leases, sales and purchase material provided by West to OCA. If it does, we must determine whether such data meet both requirements in subparagraphs (a) and (b).

The intervenor claims the lease and sale agreements are not "information." The intervenor urges "information" is not a separate and distinct category which, by itself, defines "trade secret." If this were the case, the intervenor argues, then anything described as "information" could be considered a trade secret.

■ We do not accept the intervenor's contentions. Under the plain language of the statute, "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. 2 Roger M. Millgrim, *Millgrim on Trade Secrets*, § 9.03(3)(f) (1991). One commentator explains:

Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.

Thomas J. Collin, *Determining Whether Information Is a Trade Secret Under Ohio Law*, 19 U.Tol.L.Rev. 543, 545 (1988). We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets. We conclude the lease, sale and purchase information possessed by West and its subsidiaries fits within the term "information" as used in section 550.2(4).

■ A. *Economic value.* The next question we address is whether there is proof of independent economic value as required in section 550.2(4)(a). In referring to "economic value," the subsection speaks to the value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage. *Millgrim on Trade Secrets*, § 9.03(3)(f); *Stork–Werkspoor V.V. v. Koek*, 534 So.2d 983, 985 (La.App. 1988). Thus, information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value. *See Surgidev Corp. v. Eye Technology, Inc.*, 648 F.Supp. 661, 683 (D.Minn.1986), *aff'd*, 828 F.2d 452 (1987).

■ West contends the data involved has an economic value. It urges that if sale and lease data were disclosed, competitor lessors would undercut its pricing; their lessees would gain an unfair bargaining advantage; and when West was a potential

lessee, it would be disadvantaged if lessors knew what it paid elsewhere.

The record made before the trial court is not as clear as these contentions. The information sought involves six buildings located in Colorado and Nebraska. The intervenor's affidavit indicates all six buildings have been sold in the last two years and leased back by West or its affiliates by long-term leases in an effort to protect its stockholders at the ratepayers' expense. While affidavits and testimony by West and its subsidiary employees provide opinions concerning the deleterious effects disclosure will have on West or its affiliates, such evidence is self-serving and does not contain hard facts.

West provided no evidence concerning the number of tenants in the buildings, the percentage of buildings rented to outsiders, the occupancy rates, or West's own needs concerning leasing space. While reference is made to competitors, the record is vague concerning the extent of the advantage the lease information will provide competitors. We are uncertain whether West or its subsidiaries are major players in the competitive real-estate leasing market or whether most of its leasing is between affiliates. Furthermore, we question the credibility of the expressed concern about competitors and lessees gaining this information. If in fact the sales and leases are in-house transactions between parent and subsidiary companies rather than arms-length transactions, we believe the information would be of little use to West's competitors. The burden was on West and its subsidiaries to prove that a disclosure of the lease and sales information would put West at an economic disadvantage. In our de novo review, we conclude West has failed to meet this burden. Consequently, West failed to establish its entitlement to an exemption pursuant to section 22.7(3).

■ II. *Advantage to competitors and public purpose.* Reports to governmental agencies are to be kept confidential if it is demonstrated that release of information would give an advantage to competitors and serve no public purpose. § 22.7(6). In the preceding division, we found West did not meet its burden to prove that the lease information has "economic value," a term

that includes the meaning of economic advantage to a competitor. We now find West failed to prove that release of the information would give an advantage to competitors required in section 22.7(6).

■ We also find that it would serve a public purpose to reveal information to the public which might be perceived as West's self-dealing to favor stockholders over ratepayers. We hold that West did not establish an exemption pursuant to section 22.7(6). We state unequivocally, however, that we have neither been called upon to determine whether West or its affiliates have engaged in wrongful conduct, nor do we express any opinion concerning this matter. We simply conclude the public's examination of the information properly serves a public purpose.

III. *Summary.* In summary, we find that West and its affiliates have failed to meet their burden of proof to establish an exemption based on confidentiality under either subsections 22.7(3) or (6). Any matters concerning bonds filed to stay the injunction during appeal must be addressed by the district court.

**AFFIRMED.**