**AMERICAN EXPRESS FINANCIAL ADVISORS, INC., Plaintiff,**

v.

**Richard YANTIS, Defendant.**

**No. C05–2011 LRR.**

United States District Court,
N.D. Iowa,
Eastern Division.

Feb. 28, 2005.

Schnell, Dorsey & Whitney, LLP, Minneapolis, MN, for Plaintiff.

John W. Holmes, Holmes & Holmes, Waterloo, IA, for Defendant.

Angela Ellen Dralle, Dennis Wayne Johnson, Dorsey & Whitney, Des Moines, IA, Edward B. Magarian, Todd W.

## ORDER

READE, District Judge.

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND ............................................ 821

II. PROCEDURAL BACKGROUND ................................... 824

III. LEGAL STANDARD ............................................... 825

IV. ANALYSIS ........................................................ 825
 A. Likelihood of Success on the Merits ....................... 826
 1. Breach of Contract ..................................... 827
 2. Misappropriation of Confidential Information ........... 830
 3. Conversion of Client Files .............................. 833
 4. Unfair Competition ..................................... 834
 B. Irreparable Harm ......................................... 834
 C. Balance of Harms ......................................... 836
 D. The Public Interest ....................................... 836

V. CONCLUSION ..................................................... 836

The matter before the court is Plaintiff American Express Financial Advisors, Inc.'s ("AEFA") Motion for Preliminary Injunctive Relief (docket no. 6).

### I. FACTUAL BACKGROUND

AEFA is engaged in the business of providing financial advice to individuals. AEFA hired and trained Yantis to provide financial advice and financial services to clients in Cedar Falls, Iowa and the surrounding area. In March 2000, Defendant Richard Yantis ("Yantis") became a franchiser of AEFA and executed an AEFA Independent Advisor Business Franchise Agreement (the "Franchise Agreement") that controlled the terms and conditions of his affiliation with AEFA, as well as his obligations following termination of the affiliation. Specifically with regard to Yantis' obligations during his affiliation with

AEFA, Section 10 of the Franchise Agreement states in relevant part as follows:

Independent Advisor has had and/or may have access to AEFA trade secrets and confidential information that Independent Advisor agrees has great value to AEFA. Independent Advisor agrees that because of such access, Independent Advisor is in a position of trust and confidence with respect to this information. To protect client confidentiality, AEFA goodwill, trade secrets, and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself or herself except pursuant to the System[1], or for the benefit of any other

1. The term "System," as used in the Franchise Agreement, means the following:

"Through its time, skill, effort, and money,

person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised hereunder which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement. Independent Advisor also shall not reveal any information about potential clients to whom a presentation has been made by any Independent Advisor who might reasonably be expected to do business with AEFA. Independent Advisor agrees to divulge such confidential information only to such of his or her employees as must have access to it in order to operate the Independent Financial Advisor Business. Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if of otherwise public information if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of AEFA other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of any contractual,

legal or fiduciary obligation of confidentiality to AEFA or to any other person or entity with respect to such information.

Pl.Ex. A at 13–14. Yantis also agreed to certain restrictions after the termination of his affiliation with AEFA. In particular, Section 18 of the Franchise Agreement provides:

> Upon termination of expiration of this Agreement, all rights granted hereunder to Independent Advisor shall forthwith terminate although Independent Advisor's duties under this Agreement shall continue as specified in this Section 18, and:
>
> \* \* \* \* \* \*
>
> • Independent Advisor agrees to immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System. . . .
>
> \* \* \* \* \* \*
>
> • Independent Advisor agrees to immediately deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of AEFA. To satisfy regulatory requirements, Independent Advisor agrees to immediately deliver to AEFA the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA, unless Independent Advisor

---

AEFA has developed a distinctive system that offers, through financial advisors, a variety of financial services to individuals and/or business owners (the "System")." Pl.Ex. A at 1.

transfers the Independent Financial Advisor Business as provided in Section 14. .

- Independent Advisor agrees to immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software in Independent Advisor's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Independent Advisor, and (iv) remove such computer software from any other computer programs or software in Independent Advisor's possession or control that incorporates or used such computer software in whole or in part.

- Independent Advisor agrees to comply with the covenants contained in Section 19 of this Agreement.

*Id.* at 26–28. Section 19 and Addendum 3–R of the Franchise Agreement include details of the restrictive covenant in which Yantis agreed to maintain the confidential nature of information provided to him by both AEFA and AEFA's clients and that he would not engage in certain activities, including the solicitation of other AEFA employees and advisors or AEFA clients for one year following the termination of his affiliation. Pl.Ex. A at 28–29; Pl.Ex. B at 41–45. Specifically, Section 19 of the Franchise Agreement provides in relevant part:

Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System. In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

(a)(1) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

(2) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

(3) Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

(4) Open an account for, or provide or offer to provide any investment, financial, or insurance products or

services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement.

(b)(1) Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2) Disparage AEFA, its affiliates, employees, advisors, and Products & Services.

Pl.Ex. A at 28–29.

AEFA contends that on December 31, 2004, AEFA received notice, through its Group Vice President ("GVP"), John Grieber, that Yantis was terminating his affiliation with AEFA as of January 1, 2005. AEFA avers Yantis failed to provide 14–days' written notice of his termination and failed to provide any written notice of his termination to AEFA's Minneapolis, Minnesota headquarters, both of which are required by the Franchise Agreement. AEFA further contends that on January 3, 2005, Yantis became registered with another broker-dealer, namely Brecek & Young Advisors, Inc. ("Brecek"). AEFA claims that for two months prior to terminating his affiliation with AEFA, Yantis had been in contact with many of the clients he serviced, informing each of them of his intent to leave AEFA. AEFA further alleges Yantis solicited these clients to terminate their accounts with AEFA and to follow him to Brecek. AEFA contends Yantis also solicited AEFA employees, including Sue Vannice, to terminate their employment with AEFA and join him. AEFA claims that in response to Yantis' solitication, Ms. Vannice terminated her employment with AEFA and joined Yantis at Brecek. AEFA avers that since leaving AEFA, Yantis has continued to solicit AEFA's clients with whom he worked and has transferred client accounts away from AEFA. Finally, AEFA contends Yantis has retained the files of approximately 40 clients he contacted, serviced or learned of while working as an Independent Advisor for AEFA.

## II. PROCEDURAL BACKGROUND

On January 19, 2005, AEFA filed a five-count Complaint in this court. AEFA invokes this court's diversity jurisdiction inasmuch as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00. *See* 28 U.S.C. § 1332. AEFA is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Yantis is a citizen of Iowa. Count I of the Complaint alleges a cause of action based on breach of contract. Count II alleges Yantis is liable under a theory of misappropriation of confidential information. Count III alleges Yantis is liable under a theory of conversion of client files. Count IV alleges a cause of action based on unfair competition. Count V requests injunctive relief. In its Prayer for Relief, AEFA seeks injunctive relief; an order directing Yantis to provide an accounting of all fees and commissions he received, directly or indirectly, after his resignation from AEFA from any AEFA client whom either Yantis served or whose name became known to him while he represented AEFA; an order directing Yantis to segregate all receipts from and to maintain separate accounts for all services performed for and products sold to any person who is or was an AEFA client whom either Yantis served or whose name became known to Yantis while he represented AEFA; compensatory and punitive money damages; attorneys' fees

and costs; and any additional relief the court deems just and equitable.

Also on January 19, 2005, AEFA filed the instant Motion for Preliminary Injunctive Relief. On January 27, 2005, Yantis resisted AEFA's Motion, contending he is an "independent businessman" who competes with other AEFA financial advisors, he owns his client list, and he would suffer irreparable harm if the court enjoins him from contacting his own clients while allowing AEFA to establish contacts with them. Yantis also argues enforcing the restrictive covenant in the Franchise Agreement is "contrary to common sense when the advisors are independent businessmen." On January 31, 2005, AEFA filed its reply. The court held a hearing on the Motion on February 2, 2005. Attorney Todd Schnell appeared on behalf of AEFA. Attorney John Holmes appeared with his client, Yantis. The parties gave legal arguments but did not present any evidence at the hearing. The court indicated it would issue a written order based on the evidence in the form of affidavits and exhibits previously provided to the court.

### III. LEGAL STANDARD

 Applications for preliminary injunctions generally are measured against the standards set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc). *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 368 (8th Cir.1991) (noting the district court "considered the [*Dataphase*] factors governing preliminary relief in the Eighth Circuit" when ruling on the request for a preliminary injunction); *S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir.1989) (same). The party moving for preliminary injunctive relief has the burden of establishing entitlement to such relief. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994). The *Dataphase* factors pursu-

ant to which a court should examine a request for such relief are: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the grant of a preliminary injunction is in the public interest. *Dataphase*, 640 F.2d at 114. The moving party bears the burden on all four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). A party moving for preliminary injunctive relief is required to establish a sufficient threat of irreparable harm. *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996). The district court has broad discretion when ruling on requests for preliminary injunctive relief and a reviewing court will reverse only for an abuse of discretion, clearly erroneous factual determinations, or application of an incorrect legal standard. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998).

### IV. ANALYSIS

In its Motion for Preliminary Injunctive Relief, AEFA seeks to enjoin Yantis in the following respects: (1) to immediately return all originals and copies of AEFA documents, including all AEFA client records, financial plans, financial inventories and AEFA computer software in Yantis' possession or control; (2) to immediately cease using AEFA's Confidential Information, confidential methods, procedures and techniques; and (3) to prevent him from (a) for a period of one year, or until otherwise vacated by the NASD, directly or

indirectly, soliciting any further business from any AEFA client whom Yantis served or whose name became known to Yantis while Yantis represented AEFA; (b) revealing or disclosing in any manner information contained in the records or files of AEFA, including the names, addresses, or any financial information of any AEFA client whom Yantis served or whose name became known to Yantis while he represented AEFA; (c) encouraging or inducing any AEFA clients whom Yantis served or whose names became known to Yantis while he represented AEFA who have not already transferred their accounts from AEFA to terminate any agreement or relationship with AEFA or to withdraw any investment or account currently with AEFA for one year; and (d) soliciting or hiring any AEFA employee, contractor, or franchiser, or otherwise encouraging any such individual from terminating his or her employment or relationship with AEFA. Applying the *Dataphase* factors to the evidence presented at the hearing, the court concludes as follows.

### A. Likelihood of Success on the Merits

■ The first factor the court must consider under *Dataphase* is the likelihood or probability of success on the merits. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994). In considering this factor, the court need not decide whether the movant ultimately will succeed on the movant's claims. *Glenwood Bridge, Inc.*, 940 F.2d at 371. Rather, the movant's success on the merits must be "at least... sufficiently likely to support the kind of relief it requests." *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir.1993). Thus, a showing of likelihood of success on the merits requires simply that the moving party find support for its position in the governing law. *Baker Elec. Co-op.*, 28 F.3d at 1473–74.

■ Because the court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, the substantive law governing AEFA's claims is Iowa law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (determining federal courts whose jurisdiction is based solely on diversity must apply state, rather than federal, substantive law in order to prevent parties from forum shopping). The court must give effect to the "whole law" of Iowa, which means the court must also apply Iowa's choice of law rules in determining the applicable law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (ruling the conflict of laws rules to be applied by federal courts sitting in a state must be those rules utilized by that state's courts); *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir.2004) ("The district court, in determining which state's substantive law governed, should have applied the forum state's conflict-of-laws rules, as opposed to simply applying the forum state's substantive law. In other words, the district court should have given effect to what is called the whole law of the forum.").

■ In deciding what state's laws apply to a contract or tort dispute, Iowa generally employs the "most significant relationship" test. *Smith v. Gould, Inc.*, 918 F.2d 1361, 1363 n. 3 (8th Cir.1990) (citing *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980) (contract); *Zeman v. Canton State Bank*, 211 N.W.2d 346, 348–49 (Iowa 1973) (tort)). However, the Iowa Supreme Court has adopted the *Restatement (Second) Conflict of Laws* § 187, which "permits the parties [to a contract] to agree on the law to be applied to the contract ... so long as it does not override the public policy of a state having a materially greater interest in the transaction." *Joseph L. Wilmotte & Co. v. Ro-*

*senman Bros.*, 258 N.W.2d 317, 328 (Iowa 1977).

■ In this case, the Franchise Agreement contains a choice of law provision indicating the Franchise Agreement is to be interpreted and construed exclusively under the laws of Minnesota. Pl.Ex. A at 33. The court notes, however, that Iowa public policy appears to prohibit the application of Minnesota law to the Franchise Agreement at issue in this case. The Iowa Franchise Act (the "Act"), Iowa Code § 523H *et seq.*, was created to protect franchisees operating in Iowa from abuses by franchisors and to equalize the bargaining power between franchisees and franchisors. *Equipment Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir.2002). The Act applies to any franchise in Iowa as long as the premises from which the franchise is operated are physically located in the state of Iowa. Iowa Code § 523H.2. The Act voids any choice of law provision in a franchise agreement regardless of whether the Act provides a cause of action for the injuries alleged by a plaintiff. *Id.* at § 523H.14 ("A condition, stipulation, or provision requiring the application of the law of another state in lieu of this chapter is void."). In this case, Yantis' premises were physically located in Iowa during the period he was a franchisee of AEFA. Therefore, the choice of law provision in the Franchise Agreement is void and the court must apply Iowa law to this dispute.

### 1. Breach of Contract

■ AEFA's first cause of action is based in breach of contract. Under Iowa law, in order to prevail on a breach of contract claim, a plaintiff must prove the following elements: "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). A breach of contract occurs when a party "fails to perform any promise which forms a whole or a part of the contract." *Id.*

Yantis entered into a Franchise Agreement with AEFA, including the Addendum 3–R. Under the terms of the Franchise Agreement, Yantis agreed to forbear from doing the following during his employment and for a period of one year after the termination of his Franchise Agreement with AEFA in the geographic area in which Yantis operated:

(a)(1) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

(2) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

(3) Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

(4) Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement.

(b)(1) Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2) Disparage AEFA, its affiliates, employees, advisors, and Products & Services.

Pl.Ex. A at 28–29. Addendum 3–R to the Franchise Agreement provides that AEFA agrees not to enforce its rights against Yantis under the restrictive covenant if Yantis timely and fully complies with the following conditions: (1) providing two weeks' written notice of the termination of the Franchise Agreement with a copy personally delivered to Yantis' GVP designate or to Yantis' immediate AEFA leader and a copy by facsimile or overnight mail to AEFA Corporate Office, Licensing Unit; (2) having served at least six consecutive years as an advisor for AEFA; (3) not being subject to discipline such as suspension, strict supervision, or involuntary termination; (4) not being the subject of an ongoing Compliance Rule related investigation, client complaint or adversary proceeding involving AEFA or one of its clients; (5) returning all original client files and AEFA proprietary materials to Yantis' GVP designate or immediate

AEFA leader within five business days after the date of Yantis' notice of termination; (6) on or before the effective date of termination, complying fully with Section 18 of the Franchise Agreement, which sets forth Yantis' obligations upon termination or expiration of the Franchise Agreement; (7) before and after the effective date of termination of the Franchise Agreement, not making disparaging or defamatory comments to anyone about AEFA, its affiliated companies, products, services or personnel, not recruiting or soliciting any other AEFA independent contractor, employee or franchisee to terminate their respective relationship with AEFA, and continuing to comply with Section 18 of the Franchise Agreement; (8) not sending notification of termination to clients prior to the effective date of termination, and any notice Yantis did send to clients announcing his termination could not be on AEFA stationery or envelope or include AEFA's proprietary marks on such stationery or envelope; Yantis also agreed that prior to his effective date of termination, he would not solicit or otherwise assist any AEFA client to transfer his or her assets from AEFA to another broker/dealer, insurance company or investment advisor.

Yantis concedes he entered into the Franchise Agreement and signed both the Franchise Agreement and Addendum 3–R, but he contends AEFA has no proprietary interest in his client list and it "is contrary to common sense" to enforce the terms of the Franchise Agreement against him because he was an "independent businessman" rather than AEFA's employee.

■■■■■■ Section 19 of the Franchise Agreement and Addendum 3–R constitute a restrictive covenant. A restrictive covenant [2] is "[a] promise, usually in a sale-of-

**2.** Restrictive covenants are also known as non-compete agreements, covenants not to compete, and non-competition agreements.

business, partnership, or employment contract, not to engage in the same type of business for a stated time in the same market as the buyer, partner, or employer." *Black's Law Dictionary* (Bryan A. Garner ed., 8th ed.2004) (accessed online). In Iowa, a restrictive covenant must pass the following tests to be enforceable: (1) the restriction must be reasonably necessary for the protection of the employer's business; (2) the restriction must not be unreasonably restrictive of the employee's rights; and (3) the restriction must not be prejudicial to the public. *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999) (citing *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986)). "Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area." *Id.* (quoting *Lemmon v. Hendrickson*, 559 N.W.2d 278, 282 (Iowa 1997)). In determining whether a restrictive covenant is enforceable, a court looks at "the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Id.* (quoting *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 382 (Iowa 1983)). A restrictive covenant will not be enforced if it prevents an individual from "exercising the skill and general knowledge [the employee] has acquired or increased through experience or even instruction" while employed. *Id.* (quoting *Iowa Glass Depot, Inc.*, 338 N.W.2d at 383). Upon finding a covenant unduly restrictive, a court is authorized to modify the covenant. *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa App.1992) (citing *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 374 (Iowa 1971)). The Iowa Supreme Court has determined that restrictive covenants are enforceable in the franchisor-franchisee context as well as the employer-employee context. *See Casey's Gen. Stores,*

*Inc. v. Campbell Oil Co.*, 441 N.W.2d 758 (Iowa 1989) (affirming with modifications a district court's grant of a preliminary injunction enforcing a franchise agreement's restrictive covenant).

■ The court finds it appropriate to enforce the restrictive covenant in the Franchise Agreement in this case. First, the restraint, preventing Yantis from inducing AEFA's customers and employees from leaving AEFA and following him to Brecek, is reasonably necessary to protect AEFA's business and customer goodwill. Second, the restriction is not unreasonably restrictive of Yantis' rights. The duration of restriction is only one year and the geographic area of such restriction is limited to the area in which Yantis works, not the entire country. *See e.g. Phone Connection, Inc.*, 494 N.W.2d at 449–50 (recognizing the Iowa Court of Appeals had examined recent Iowa cases and had found the duration of a valid restrictive covenant typically ranges from two to three years). Third, the court finds the restriction is not prejudicial to the public. Looking at the other relevant factors such as the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation being restrained, the court finds the factors weigh in favor of enforcing the restrictive covenant. Yantis' office with AEFA was located near his customers, but several other AEFA Independent Advisors work in the same geographic area, so the customers are not left without any AEFA offices to visit with questions. The business is financial planning and investing, so Yantis was exposed to client and financial information maintained by AEFA in which AEFA has an interest in keeping confidential. The nature of the occupation being restrained, financial advisor, does not raise any particular problems. Furthermore,

the court finds the restrictive covenant in the Franchise Agreement does not prevent Yantis from exercising the skills and general knowledge he acquired or increased through experience or instruction during his affiliation with AEFA. *See* Pl.Ex. A at 30 ("Nothing in this Agreement will prevent Independent Advisor from engaging in a competitive business consistent with the covenants in this Section 19, including serving as a financial advisor or consultant affiliated with another firm, after this Agreement expires or is terminated.").

AEFA demonstrated that Yantis failed to fully comply with the requirements set forth in Section 19 and Addendum 3–R of the Franchise Agreement. Specifically, AEFA showed Yantis failed to do the following: (1) provide two weeks' written notice of his intent to terminate his affiliation with AEFA; (2) provide any written notice to AEFA's Corporate Office; (3) return all AEFA client files; (4) forbear from soliciting and hiring other AEFA employees away from AEFA; and (5) forbear from soliciting AEFA clients to transfer their assets from AEFA to another broker/dealer, insurance company or investment advisor prior to January 1, 2005, the effective date of his termination. Because Yantis did not comply with the requirements set forth in Addendum 3–R, AEFA has demonstrated it is not required to forbear from enforcing the one-year restrictive covenant found in Section 19 of the Franchise Agreement. AEFA demonstrated Yantis is currently in violation of the provisions of the Franchise Agreement by (1) inducing AEFA clients to terminate their agreements with AEFA; (2) soliciting clients whom Yantis contacted, serviced or learned about while operating under the Franchise Agreement to open non-AEFA accounts and selling them non-AEFA investment, financial or insurance products or services; (3) offering to provide investment, financial, or insurance products or services to AEFA clients whom Yantis contacted, serviced or learned about while operating under the Franchise Agreement; and (4) inducing Ms. Vannice, who was employed by AEFA, to leave her employment with AEFA and subsequently employing her at Brecek.

Finally, AEFA demonstrated it has been and continues to be damaged as a result of Yantis' breach. Specifically, AEFA has demonstrated it has suffered damages in the form of lost goodwill, lost clients, and at least one lost employee due to Yantis' actions prior to the expiration of the one-year restrictive covenant. For all of the above reasons, the court finds AEFA has demonstrated the likelihood of success on the merits of its breach of contract claim.

### 2. *Misappropriation of Confidential Information*

 AEFA contends Yantis misappropriated confidential information by keeping client names, addresses, and data, including suitability information, investments and investment history, financial plans, financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation, client lists and other financial information. Trade secrets are protected under the Iowa Uniform Trade Secrets Act, Iowa Code Chapter 550 (the "Trade Secrets Act"). The issue of whether any of the information AEFA seeks to protect constitutes a trade secret under the Trade Secrets Act is a mixed question of fact and law. *Economy Roofing & Insulating v. Zumaris*, 538 N.W.2d 641, 648 (Iowa 1995). The question of law involved in making such a determination is whether the information at issue constitutes a trade secret under the first part of the definition of "trade secret" set forth in Iowa Code § 550.2(4). This section defines "trade secret" as "information, including but not limited to a formula, pattern, compilation,

program, device, method, technique or process...." Iowa Code § 550.2(4). As the Iowa Supreme Court has explained:

> Under the plain language of [Iowa Code § 550.2(4) ], "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples....
>
> One commentator explains: Trade secrets can range from customer information to financial information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>
> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets. *US West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993).

*Economy Roofing*, 538 N.W.2d at 646–47.

■ Once the court has determined whether the information at issue falls within the definition of "trade secret" set forth in Iowa Code § 550.2(4), the court must examine whether the information fits within the additional parts of the definition of "trade secret" articulated in subsections (a) and (b) of Iowa Code § 550.2(4). The court must decide, as a question of fact, whether the information:

> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Economy Roofing*, 538 N.W.2d at 646 (quoting Iowa Code § 550.2(4)). In short, the court must decide the factual issues of whether the information at issue has independent economic value and whether the party claiming the information is a trade secret has taken reasonable efforts to maintain the secrecy of the information. *APAC Teleservices, Inc. v. McRae*, 985 F.Supp. 852, 864 (N.D.Iowa 1997). The Iowa Supreme Court has further defined the economic value prong of the analysis as "information kept secret that would be useful to a competitor and require cost, time and effort to duplicate...." *US West*, 498 N.W.2d at 714. Further, the Iowa Supreme Court has specified the key to the secrecy inquiry is whether the party seeking to protect the information has taken efforts that are reasonable under the circumstances to maintain the secrecy of the information. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994).

■ AEFA's misappropriation claim alleges AEFA has protectable confidential information in its client names, addresses, and data, including suitability information, investments and investment history, financial plans, and financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation, client lists and other financial information. The court finds AEFA likely will be able to establish this information falls within the legal definition of the term "trade secret" set forth in Iowa Code § 550.2(4) as the information is a compilation of information about AEFA's clients and their financial histories and future goals. *See Economy Roofing*, 538 N.W.2d at 647 (recognizing trade secrets include customer information).

Turning to the factual inquiry, the court finds AEFA is likely to succeed in showing that the information derives economic value from not being generally known to and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use. AEFA alleges its client files contain numerous information regarding AEFA's clients and their financial histories and future goals. This information obviously would be helpful to AEFA's competitors and would require cost, time and effort to duplicate.

AEFA also has presented evidence that it makes a significant effort to guard the secrecy of this information. AEFA insists that due to the benefit of the franchise relationship, backing, and training provided by AEFA and the critical nature of the information provided, AEFA requires every financial advisor to execute a contract designed to protect that information. AEFA presents the Franchise Agreement signed by Yantis, which defines "confidential information" as follows:

> Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if of otherwise public information if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of AEFA other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives or any other person or entity in breach of any contractual,

legal or fiduciary obligation of confidentiality to AEFA or to any other person or entity with respect to such information.

Pl.Ex. A at 13–14. Yantis also agreed to require any members of his staff having access to AEFA's confidential information or information about current and potential clients to sign a confidentiality agreement. *Id.* at 14. With regard to the use of any confidential information, Yantis agreed in his Franchise Agreement to:

> not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself ... except pursuant to the System, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised under which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement....

*Id.* at 13. Yantis additionally agreed that for one year following termination of the Franchise Agreement, Yantis could not solicit and service any of AEFA's clients Yantis contacted, serviced, or learned about while working pursuant to the Franchise Agreement. *Id.* at 28. After one year, Yantis can solicit and service any of AEFA's clients whom he contacted, served, or learned about while working as an Independent Advisor for AEFA. *Id.* at 30. However, even after one year, Yantis cannot directly or indirectly use any confidential information, including client files and lists obtained from AEFA. *Id.* The

court finds AEFA likely will be able to show it has taken efforts that are reasonable under the circumstances to guard the secrecy of the information at issue here. In light of the foregoing, the court concludes AEFA is likely to succeed in establishing that the information at issue meets both the legal and the factual aspects of the definition of the term "trade secret" set forth in Iowa Code § 550.2(4).

The court must next determine whether AEFA is likely to succeed on the merits of its claim that Yantis has misappropriated trade secrets. The Trade Secrets Act defines misappropriation, in pertinent part, as: (1) disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret; and (2) disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Iowa Code § 550.2(3)(b), (d). The Trade Secrets Act defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1). Under the Trade Secrets Act, a plaintiff can prove trade secret misappropriation in violation thereof by proving inevitable disclosure. *See* Iowa Code § 550.3(1) (codifying protection against threatened misappropriation).[3]

In support of its claim that Yantis has misappropriated confidential information, AEFA points to the fact that under Section 10 of the Franchise Agreement, Yantis agreed that client records are confidential information. Yantis agreed to not disclose or employ for personal use any confidential information or trade secrets, including current and potential client information. Furthermore, Yantis' staff members who came in contact with the client lists and other confidential information were required to enter into confidentiality agreements in order to prevent disclosure of such information. AEFA contends Yantis misappropriated AEFA's client files by refusing to return those files when he was contractually obligated to do so and, through such action, is injuring and attempting to injure AEFA's relationships with its clients.

The court concludes AEFA has shown a likelihood of success on the merits of its claim that Yantis has acted in violation of the Trade Secrets Act. Assuming the validity and enforceability of the Franchise Agreement into which Yantis entered with AEFA, Yantis was under a duty to maintain the secrecy or confidentiality of the client records. AEFA is likely to succeed in showing Yantis inevitably will use the information he acquired through improper means—through a breach of his duties under his Franchise Agreement to keep this information secret. Therefore, the court finds AEFA has demonstrated the likelihood of success on the merits of its misappropriation claim.

### 3. Conversion of Client Files

 Under Iowa law, conversion is " 'the wrongful control or dominion over another's property contrary to that person's possessory right to the property. The wrongful control must amount to a serious interference with the other person's right to control the property.' " *Crawley v. Price,* 692 N.W.2d 44, 49 (Iowa App.2004) (quoting *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 594 (Iowa 1999)). A person may commit conversion "by obtaining the chattel through fraud or by using a chattel, properly within

---

**3.** Section 550.3(1) provides, in pertinent part, "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation."

one's control, in an unauthorized manner." *State v. Hollinrake,* 608 N.W.2d 806, 808 (Iowa App.2000) (citing *Restatement (Second) of Torts* §§ 221(b), 228 (1964)). A plaintiff alleging conversion must demonstrate a causal connection between the defendant's actions and the plaintiff's damages. *Id.* Such damages properly include " 'the reasonable and necessary expenses incurred in recovering the property....' " *Id.* at 809 (quoting *State v. Taylor,* 506 N.W.2d 767, 768 (Iowa 1993)); *see also State v. Bonstetter,* 637 N.W.2d 161, 169 (Iowa 2001) (holding the reasonable and necessary expenses incurred in recovering the misappropriated funds are a proper element of damages in a conversion action based on misappropriation of funds).

▮ The Franchise Agreement states the client files are the property of AEFA. Pl.Ex. A at 14 ("All original books and records containing Client lists and/or information and transactions belong to AEFA and must be returned to AEFA upon termination or expiration of this Agreement...."). Furthermore, the Franchise Agreement provides, "Independent Advisor understands and acknowledges that if Independent Advisor terminates this Agreement, AEFA shall have the right to continue to actively offer all Products and Services to Clients the Independent Advisor serviced at AEFA." Pl.Ex. A at 29. AEFA demonstrated that Yantis wrongfully exercised control over AEFA's property by retaining numerous files when Yantis terminated his employment with AEFA in violation of the Franchise Agreement. Furthermore, AEFA showed that Yantis' exercise of control seriously interfered with AEFA's right to control the client files and actively offer products and services to those clients. AEFA is likely to be able to demonstrate the connection between Yantis' actions and the damages AEFA has incurred in attempting to recover the client files. Therefore, the court finds AEFA has demonstrated the likeli-

hood of success on the merits of its conversion claim.

### 4. Unfair Competition

▮ Under Iowa law, "[t]he doctrine of unfair competition is based on the principle of common business integrity. It goes to the question of a defendant's methods and representations in marketing his products, not to his right to manufacture or produce them." *Basic Chemicals, Inc. v. Benson,* 251 N.W.2d 220, 231 (Iowa 1977) (citing *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1263 (5th Cir.1971)). The Iowa Supreme Court has recognized, " '[t]he essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances.' " *Id.* (quoting *Johnson Gas Co. v. Reliable Gas Co.,* 233 Iowa 641, 10 N.W.2d 23, 27 (Iowa 1943) (internal quotation omitted)).

In its Complaint, AEFA merely alleges Yantis's actions constitute unfair competition. AEFA has not presented any evidence in support of its unfair competition claim. Therefore, the court finds AEFA has not demonstrated the likelihood of success on the merits of its unfair competition claim.

### B. Irreparable Harm

▮ The second *Dataphase* factor the court must consider is the degree of irreparable harm, if any, AEFA would suffer if the court does not grant the preliminary injunction. *See Dataphase,* 640 F.2d at 114 (setting out the second factor a court is to consider, i.e., the threat of irreparable harm to the plaintiff if the court does not enjoin the defendant). The party moving for a preliminary injunction may show irreparable harm by showing

that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473; *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir.1992). Proof that an adequate legal remedy exists supports an inference that no irreparable harm will occur. *Moore Bus. Forms, Inc. v. Wilson*, 953 F.Supp. 1056, 1062 (N.D.Iowa), *aff'd,* 105 F.3d 663 (8th Cir.1996). The fact that a valid damages claim is available does not necessarily foreclose the issuance of injunctive relief, however, because money damages may not fully compensate a movant for less tangible injuries. *Id.*

AEFA argues that unless Yantis is enjoined, AEFA will suffer irreparable injury through the loss of confidential client information and loss of client goodwill generated by Yantis through AEFA's support and dedication to the professional training, growth, and development of its financial advisors.

Intangible injuries, such as injury to goodwill and business relationships with customers, may be found to constitute irreparable harm. *Moore Bus. Forms, Inc.*, 953 F.Supp. at 1062. "The courts of a number of states have held that the mere violation of a valid covenant not to compete supports an inference of the existence of the threat of irreparable harm." *Id.* (citations omitted). The Eighth Circuit Court of Appeals has employed this approach without concern of any particular state's laws. *Id.; N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir.1984) (affirming the trial court's finding of a threat of irreparable harm based on evidence the defendants, former sales agents of the plaintiff insurance company, were actively soliciting business from its policy holders in violation of the restrictive covenant). The Eighth Circuit Court of Appeals has recognized that where individuals violate a valid restrictive covenant and no injunction issues, the plaintiff must file a separate lawsuit

for damages each time one of the violators solicits away another customer or the plaintiff risks losing all of its customers and goodwill. *N.I.S. Corp.*, 724 F.2d at 710. This court has recognized that, following *N.I.S. Corp.*, "[i]f the restrictive covenants at issue prove to be valid and enforceable, continued violation of the covenants will cause the plaintiff to suffer some irreparable harm to goodwill and its established relationships." *Moore Bus. Forms, Inc.*, 953 F.Supp. at 1063.

Likewise, the Iowa Supreme Court has determined the injury to a plaintiff "would be irreparable in the absence of an injunction [where] the customers [the defendant] pirated from the company would be permanently lost." *Presto–X–Company v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989). Therefore, the Iowa Supreme Court opined an injunction was the sole method of returning the employer to the position it would have been in if the employee had not breached the restrictive covenant. *Id.*

■ The court finds that AEFA has shown irreparable harm will occur if the preliminary injunction is not granted. Money damages will not adequately compensate AEFA for any damages it suffers due to the loss of its clients and employees prior to the expiration of the one-year restrictive covenant. AEFA has shown it will suffer irreparable harm in the absence of an injunction because the customers and employees Yantis solicited to leave AEFA with him will be permanently lost. *See id.* Furthermore, AEFA has shown that if the restrictive covenant in the Franchise Agreement is ultimately determined to be valid, Yantis' continued violation of the restrictive covenant will cause AEFA to suffer irreparable harm to its goodwill and its established relationships with clients. *See N.I.S. Corp.*, 724 F.2d at 710; *Moore Bus. Forms, Inc.*, 953 F.Supp. at 1063.

## C. Balance of Harms

Third, the court must balance the harm to AEFA against the injury to Yantis. *See Dataphase*, 640 F.2d at 114 (laying out the third factor for consideration—the balance of harm to the plaintiff in failing to enjoin the defendant against the harm to the defendant or third parties if the preliminary injunction motion is granted). AEFA contends the impact upon Yantis is minimal as he is only being asked to conform to his contractual agreement with AEFA. AEFA maintains that Yantis is free to compete with AEFA in any location he wishes to do so as long as he does not use AEFA's confidential business and client information and does not solicit AEFA clients for the one-year term to which he previously agreed. AEFA urges that Yantis will not be required to wait for a lengthy period of time for a ruling on the merits of the dispute because upon the court's entry of a preliminary injunction, the NASD will commence a hearing within fifteen days regarding any ongoing injunctive relief. Yantis argues he will be substantially harmed if the court enjoins him from contacting the individuals on his client list. The court finds the balance of harms weighs in favor of granting the preliminary injunction, especially in light of the fact the parties will be able to begin arbitration of the merits of their dispute within fifteen days.

## D. The Public Interest

The fourth and final *Dataphase* factor to be considered is whether public interest favors enforcing valid contracts and preventing the unauthorized use and disclosure of trade secrets and confidential information. *See Dataphase*, 640 F.2d at 114 (setting forth consideration of the public interest as the last factor to be considered when deciding whether a preliminary injunction is appropriate). The court opines it does. The public interest calls for enforcement of a valid restrictive covenant clause in a contract. *N.I.S. Corp.*, 724 F.2d at 710; *see also Diversified Fastening Sys., Inc. v. Rogge*, 786 F.Supp. 1486, 1493 (N.D.Iowa 1991) ("It is also [Iowa's] public policy to enforce contracts freely entered into by competent contracting parties, including non-disclosure and non-competition agreements."). Additionally, "Iowa courts have recognized that the public interest is served by preventing the unauthorized disclosure of trade secrets." *APAC Teleservices, Inc.*, 985 F.Supp. at 868 (citing *Diversified Fastening Sys., Inc.*, 786 F.Supp. at 1493).

## V. CONCLUSION

**IT IS HEREBY ORDERED:**

(1) Plaintiff AEFA's Motion for Preliminary Injunctive Relief (docket no. 6) is GRANTED.

(2) Defendant Richard Yantis shall immediately return to AEFA all originals and copies of AEFA documents, including all AEFA client records, financial plans, financial inventories and AEFA computer software in Yantis' possession or control.

(3) Yantis shall immediately cease using AEFA's Confidential Information, confidential methods, procedures and techniques as set forth in the Franchise Agreement.

(4) Yantis, his agents, servants, employees, officers, attorneys, successors, and assigns, and all persons, firms, and corporations acting in connection or participation with them or on their behalf are enjoined from:

(a) For a period of one year, or until otherwise vacated by the NASD or the agreement of the parties, directly or indirectly, soliciting any further business from any AEFA client whom Yantis served or whose name became known to

Yantis while Yantis represented AEFA;

(b) Revealing or disclosing in any manner information contained in the records or files of AEFA, including the names, addresses, or any financial information of any AEFA client whom Yantis served or whose name became known to Yantis while he represented AEFA;

(c) Encouraging or inducing any AEFA clients whom Yantis served or whose names became known to Yantis while he represented AEFA, who have not already transferred their accounts from AEFA to terminate any agreement or relationship with AEFA or to withdraw any investment or account currently with AEFA for one year; and

(d) Soliciting or hiring any AEFA employee, contractor, or franchiser, or otherwise encouraging any such individual from terminating their employment or relationship with AEFA.

**SO ORDERED.**