# IN THE SUPREME COURT OF IOWA

No. 10–1719

Filed July 27, 2012

IOWA FILM PRODUCTION SERVICES;
MISSISSIPPI FILMS, INC.; POLYNATION
PICTURES, INC.; FIELD OF SCREAMS, LLC;
UNDERGROUND FILMS, INC.; TICKET OUT
PRODUCTIONS; TRICOAST IOWA PRODUCTIONS,
LLC; GPX DEVELOPMENT, LLC; SEPTEMBER
PRODUCTIONS LLC; LUCKY MP, LLC; and
RECESS FILM PRODUCTION, LLC,

       Appellees,

vs.

IOWA DEPARTMENT OF ECONOMIC
DEVELOPMENT,

       Appellant,

and

DES MOINES REGISTER & TRIBUNE
COMPANY,

       Intervenor.

---

Appeal from the Iowa District Court for Polk County, Artis I. Reis, Judge.

The State appeals from an order obtained by producers of films that registered for state tax credits directing that the films' final budget summaries be kept confidential. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Deputy Attorney General, Adam Humes, Assistant Attorney General, for appellant.

Jonathan C. Wilson, Scott M. Brennan, and Sarah E. Crane of Davis, Brown, Koehn, Shors and Roberts, P.C., Des Moines, for appellees.

**MANSFIELD, Justice**.

This case requires us to decide whether filmmakers receiving tax credits from the State of Iowa under the State's tax credit program can enjoin the State from releasing summaries of their films' final budgets to the public. We conclude they cannot. On this record, the budget summaries do not qualify as trade secrets under Iowa Code section 22.7(3) (2009). Nor can they be considered "[r]eports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose" under Iowa Code section 22.7(6). Finally, the filmmakers have failed to meet section 22.8's requirements for injunctive relief by demonstrating disclosure would "clearly not be in the public interest" and would "substantially and irreparably injure any person or persons." Accordingly, we reverse the judgment of the district court and remand for further proceedings.

## I. Facts and Procedural History.

In 2007, the Iowa General Assembly created the Film, Television, and Video Project Promotion Program (the "Film Program").[1] *See* 2007 Iowa Acts ch. 162, § 1 (codified as amended at Iowa Code §§ 15.391–.393 (2009)). The purpose of the Film Program was

> to assist legitimate film, television, and video producers in the production of film, television, and video projects in the state and to increase the fiscal impact on the state's economy of film, television, and video projects produced in the state.

Iowa Code § 15.392. In the fall of 2009, after an audit uncovered abuses, the governor administratively suspended the Film Program. The program

---

[1]The State has requested that we take judicial notice of various criminal proceedings and a report of the state auditor relating to the Film Program. We deny the request and base our factual summary on the record as made below.

was legislatively suspended in April 2010. *See* 2010 Iowa Acts ch. 1138, § 5 (codified at Iowa Code § 15.393(5) (2011)).

While it was in operation, the Film Program was administered by the Iowa Department of Economic Development (IDED). *See* Iowa Code § 15.393(1) (2009). Filmmakers had to register their projects with IDED. *Id.* To be registered, a project had to be "a legitimate effort to produce an entire film . . . or . . . video segment in the state," had to spend at least $100,000 in Iowa, and had to "have an economic impact on the economy . . . sufficient to justify assistance under the program." *Id.* § 15.393(1)(*a*)–(*b*).

Projects registered with IDED under the Film Program were eligible to receive two separate twenty-five percent transferable tax credits. *See id.* § 15.393(2)(*a*)(1), (*b*)(1).[2] The Film Program was promoted (inaccurately, according to the State) as "half-price filmmaking."

Plaintiffs Iowa Film Production Services, Mississippi Films, Inc., Polynation Pictures, Inc., Field of Screams, LLC, Underground Films, Inc., Ticket Out Productions, TriCoast Iowa Productions, LLC, GPX Development, LLC, September Productions LLC, Lucky MP, LLC, and Recess Film Production, LLC (collectively "Producers") all sought to take part in the Film Program. Each of them completed an "Application for Registration" and submitted it to IDED. *See* Iowa Admin. Code r. 261—36.3 (2009).

The application form required information to be provided regarding: the project title, a synopsis of the project, the production company to receive incentive, lead production names and contacts,

---

[2]The credits could be transferred to "any person or entity" and offset against various taxes owed to the State of Iowa. Iowa Code § 15.393(2)(*a*)(3). Typically, they would be sold through a broker to a person or entity with existing state tax liability.

production dates, production type, format, distribution, current production budget, qualified in-state expenditures, and a schedule of project investors.

In addition, the application asked the filmmaker to indicate whether there was information in the application "for which the business [was] requesting confidential treatment." If so, the application referred the filmmaker to the following notice:

**NOTICE TO APPLICANTS—OPEN RECORDS**

PLEASE NOTE: UPON SUBMISSION OF A SIGNED APPLICATION, THE CONTENTS AND ATTACHMENTS TO THIS APPLICATION FOR REGISTRATION IN THE IOWA FILMS TELEVISION AND VIDEO PROJECT PROMOTION PROGRAM ARE PUBLIC RECORDS WHICH ARE AVAILABLE FOR PUBLIC INSPECTION AND COPYING.

INFORMATION SUBMITTED WITH THIS APPLICATION MAY BE TREATED CONFIDENTIAL IF:

(1) IT MEETS THE LEGAL REQUIREMENTS FOR CONFIDENTIAL STATUS, AND

(2) THE APPLICANT FILES A WRITTEN REQUEST FOR CONFIDENTIALITY, AND

(3) THE DEPARTMENT ISSUES WRITTEN CONFIRMATION THAT THE INFORMATION MEETS THESE REQUIREMENTS AND WILL BE TREATED AS CONFIDENTIAL.

IF NO REQUEST FOR CONFIDENTIAL TREATMENT OF RECORDS IS MADE, THE DEPARTMENT WILL PROCEED AS IF THE APPLICANT HAS NO OBJECTION TO DISCLOSURE TO MEMBERS OF THE PUBLIC.

Iowa's Open Records Law. The Iowa Department of Economic Development (IDED) is a state agency and it is subject to Iowa's Open Records law (Iowa Code, Chapter 22). Treatment of information submitted to IDED in this application is governed by the provisions of the Open Records law. All public records are available for public inspection. Some public records are considered confidential and will not be disclosed to the public unless ordered by a court, the lawful custodian of the record, or by another person duly authorized to release the information.

Legal requirements for confidential treatment of public records.

The information submitted as part of this application information will be available for public inspection, unless a request for confidentiality has been submitted by the applicant in the required form and approved in writing by IDED. Following are the classifications of records which are recognized as confidential under Iowa law and which are most frequently applicable to business information submitted to IDED:

Trade secrets [Iowa Code § 22.7(3).]

Reports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose. [Iowa Code § 22.7(6).]

. . . .

Communications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination. [Iowa Code § 22.7(18).]

In addition, the notice listed "Helpful Resources," which included links to the Iowa Open Records law, IDED administrative rules, and the Iowa Attorney General's website.

After this notice, the application set forth instructions for completing a "Request for Confidential Treatment Form." Both an example of a completed form and a blank form were provided. The instructions stated, "IDED will review the request and provide written confirmation to you of its approval or denial."

The form required the filmmaker to "state which section(s) of the application you want kept confidential" and to indicate a "[l]egal basis for [the] request." Several potential grounds for confidential treatment could be checked including the three statutory grounds already noted—Iowa Code sections 22.7(3), (6), and (18). A catchall option was also provided:

"Other (provide legal citation e.g. reference to a state or federal law not listed above)."

The sample completed form included a request that "[b]udget and in-state expenditures sections and all investor contact names and numbers" be kept confidential. It had only the section 22.7(18) box checked, with the following explanation:

> Releasing the exact amounts budgeted for "talent", "producer" or "director" or other above-the-line costs would give an unfair advantage to competitors and serves no public purpose. If our competitors knew how much of the total project budget was allocated to these categories they would be able to undercut negotiating strength otherwise present in private agreements.

The ensuing paragraphs of the application contained various statements and certifications. Among other things, the filmmaker was required to acknowledge and agree that its books would be subject to audit and that it would be required to sign a contract. Finally, just before the signature block, the application contained a multiparagraph "Certification & Release of Information":

> **<u>Certification & Release of Information</u>**
>
> . . . .
>
> I [the applicant] understand that certain information submitted to IDED related to this application may be subject to Iowa's Open Record Law (Iowa Code, Chapter 22).
>
> I understand this application is subject to final approval by IDED and the Project may not be initiated until final approval is secured.
>
> I hereby certify that all representations, warranties, or statements made or furnished to IDED in connection with this application are true and correct in all material respect[s].

Below the signature block was a section entitled, "For IDED use only." In that section, IDED could indicate "Application approved" or

"Application denied." As noted, each of the Producers submitted at least one completed application to IDED. In several instances, but not all, IDED completed this internal use section and marked "Application approved." In any event, it is not disputed that each of the Producers' applications was approved.[3]

Each of the Producers also completed a "Request for Confidential Treatment" form as part of its application. The legal grounds given for the requests were either section 22.7(6)—"[r]eports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose"—or section 22.7(18):

> [c]ommunications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination.

Although section 22.7(3)'s exemption for trade secrets was provided as an additional option, none of the Producers checked this box as a requested ground for keeping their information confidential.

As noted above, each Producer was required to execute a contract with IDED upon approval of its application. *See* Iowa Admin. Code r. 261—36.5(2). Among other things, the contract required the Producer to submit a schedule of qualified expenses, known as a "FORM Z: Final Budget Expenditure Report," once the project was completed. The Form Z was not part of the application itself, nor logically could it be, since actual expenses would not be known until the film had been made.

Form Z's were used by IDED to verify the eligibility of expenditures for the tax credits. *See* Iowa Code § 15.393(2)(*a*)(3); Iowa Admin. Code r.

---

[3]Apparently, when an application was approved, IDED issued an award letter.

261—36.7(4). A completed Form Z detailed all qualified expenditures on the film project.

In addition, each Form Z contained a two-page summary (the Form Z Summary). Instead of the detail provided in the Form Z itself, the Form Z Summary set forth totals for forty-six categories of expenses, such as "STORY & RIGHTS," "WRITING," "PRODUCER & STAFF," "DIRECTOR & STAFF," and "TALENT & STAFF."

Of the Producers, six of them—Iowa Film Production Services, Mississippi Films, Inc., Polynation Pictures, Inc., Ticket Out Productions, Field of Screams, LLC, and Underground Films, Inc.—submitted at least one Form Z. However, only the first four of these Producers—Iowa Film Production Services, Mississippi Film, Inc., Polynation Pictures, Inc., and Ticket Out Productions—received certificates granting the qualified expenditure tax credits. *See* Iowa Code § 15.393(2)(*a*)(3). These tax credits totaled over $14 million. It is not disputed that the overall dollar amount of tax credits awarded to any project by IDED is public information.

In the fall of 2009, public interest in the Film Program began to mount as certain irregularities came to light. Consequently, IDED received requests for public records regarding the Film Program from two television stations, a Des Moines attorney, and the Des Moines Register & Tribune Company, the intervenor in this case.[4] Based on these requests, IDED sent letters to all registrants in the Film Program to inform them how IDED planned to move forward with the release of their information. In its initial letter dated November 20, 2009, IDED acknowledged that the registrants had "requested confidential treatment

---

[4]The Des Moines Register intervened in the action in support of IDED's position.

of some or all of the budget and investor information relating to [their] project[s]" and that "[i]nitially, IDED agreed to maintain the information as confidential as [they] requested." However, the November 20 letter went on to state:

> In light of recent events, IDED has reassessed the information you submitted with a request for confidential treatment and has concluded that the budget and investor documents you submitted should no longer be kept confidential. In making this decision, IDED considered several factors, in addition to the strong public interest in disclosure . . . . These factors include: (1) whether the records contain the type of information that qualifies for confidential treatment, (2) whether the records contain information that could be used by a competitor to gain an economic advantage, and (3) whether release of the information would result in an adverse financial impact. On balance, IDED has concluded that the need for confidentiality of budget and investor information is outweighed by the public's right to information about IDED's activities in connection with the Film Program.

In this initial letter, IDED explained its plan to release "all of the budget and investor documents [registrants] submitted as part of [their] application in the Film Program and either Form Z or another final budget expenditure report." IDED advised that the information would be released on December 8, 2009, ten business days from the date of the letter, unless the registrants filed a petition requesting an injunction under Iowa Code section 22.8.

However, on December 8, 2009, IDED did not disclose the records but instead sent another letter to the registrants, which stated:

> Since [November 20, 2009], IDED and the AG's Office have been in discussions both with some of the entities that made public records requests and with members of the film industry. Based on these discussions, IDED, again in consultation with the AG's Office, has decided to change its plans in an effort to address the concerns raised by representatives of the film industry, while still meeting IDED's responsibilities under Iowa's Public Record Laws. Specifically, IDED only will release the summary section of

Form Z for film projects that have submitted information to IDED in order to receive tax credits. . . . A generic summary section of a Form Z has been attached for your review.

These records will be released on December 11, 2009, unless you file a petition to request an injunction pursuant to Iowa Code section 22.8 prior to that date.

A number of registrants responded that they consented to the release of their Form Z Summaries. The Producers, however, filed an action for a temporary injunction and other relief in the Polk County District Court.

In their petition, the Producers maintained that their budget and expenditure information was confidential and exempt from disclosure under section 22.7(3), (6), (8), and (18) of the Iowa Code. In the alternative, the Producers argued they were entitled to injunctive relief under Iowa Code section 22.8, because examination of the records "would clearly not be in the public interest" and "would substantially and irreparably injure" the Producers and third parties. *See id.* § 22.8(1)(*a*)– (*b*). The Producers also sought an award of costs and attorneys' fees under section 22.10.[5]

IDED responded that none of the confidentiality exemptions in section 22.7 applied to the Form Z Summaries. IDED further argued that even if the summaries did qualify as confidential under that section, either "a court" or IDED as the "lawful custodian of the records" had

---

[5]This section provides:

Upon a finding by a preponderance of the evidence that a lawful custodian has violated any provision of this chapter, a court:

Shall order the payment of all costs and reasonable attorney fees, including appellate attorney fees, to any plaintiff successfully establishing a violation of this chapter in the action brought under this section.

Iowa Code § 22.10(3)(*c*).

discretion to release them. *See id.* § 22.7 ("The following public records shall be kept confidential, unless otherwise ordered *by a court, by the lawful custodian of the records . . . .*" (emphasis added)). IDED also contended that granting an injunction under section 22.8 was not warranted because the Producers had not demonstrated disclosure "would clearly not be in the public interest" and would result in "substantial[] and irreparabl[e] injur[y]." IDED further argued that because a violation under the Open Records Act had not occurred, the Producers were not entitled to costs and attorneys' fees under section 22.10.

The district court held a hearing on March 24, 2010. The court decided initially that only the Form Z Summaries were at issue and, thus, potentially subject to disclosure. Next, the district court addressed the Film Program registrants that had received letters from IDED regarding disclosure of their records but had chosen not to contest the release of the information. The district court ruled that

> as to those filmmakers who are not plaintiffs in this matter, who were notified by the IDED as to the release of the form Z summaries and did not participate in this lawsuit, [their] information could be released by the IDED.

At the hearing, Kip Konwiser testified as a witness on behalf of two of the Producers, GPX Development, LLC and Recess Film Production, LLC. Konwiser is a resident of Los Angeles with an M.F.A. from the University of Southern California cinema school of television and producing. Konwiser explained that he has been involved in the entertainment industry for more than twenty years, "in most every aspect of making movies, television, and music." He has experience representing actors and writers and has served as a talent agent, manager, studio executive, president, and "a full-service producer."

Konwiser maintains membership in the Academy of Motion Picture Arts and Sciences, the Producers Guild of America, and the Directors Guild of America; participates in film festivals; and has taught film industry courses from the high school to graduate school level.

Konwiser testified that he has produced approximately thirty movies, in addition to television movies and series. He stated that trust is essential for the film industry to function:

> Hollywood, our industry, is built on trust. We're a small community. Those of us that are legitimately making movies that get released around the world on the kind of profile that the industry needs in order to sustain itself as an industry, those of us in that industry—and there is not a lot of us—we rely on the trust and confidence between each other. And this has never, ever been an issue before, ever, anywhere else. This is now suddenly a new thing that Iowa is going to put upon our industry, if this shouldn't be ruled appropriately, in our opinion.

Konwiser also testified that "IDED contacted me and asked me to bring productions to Iowa," touting the tax credit as an incentive: "[T]hey were going to guarantee in writing, in contract, a 50 percent return."[6] Konwiser personally submitted two applications to IDED, for movies entitled "Field Trip" (later renamed "Blackbeard") and "Soaked." He claimed he "had the absolute assurance from the IDED office, prior to . . . submitting [his applications], that this information would remain confidential. It was on that confidence that that information was provided." Konwiser also testified that no other state to his knowledge

---

[6]As noted, the State disputes the "half-price filmmaking" terminology as an accurate summary of the relevant tax credits. It asserts the maximum potential tax credit amounted to twenty-five percent of overall expenditures. *See* Iowa Code § 15.393(2)(*b*)(1) (stating that a taxpayer "shall not claim" the second twenty-five percent tax credit "for qualified expenditures for which" the first twenty-five percent tax credit was claimed).

has ever released information about film projects in a Form Z Summary format.

Konwiser's applications included requests for confidential treatment. These forms were essentially filled out the same way as the sample form in the application materials. Konwiser testified that IDED personnel advised him not to deviate from the sample form. Konwiser also testified that IDED never notified him in writing of an approval or denial of his request for information to be kept confidential.

When asked why confidential treatment was necessary, Konwiser gave the example of an actor who usually receives $10 million for a movie but may act in an independent film for $100,000, expecting this amount will be kept confidential. Konwiser also noted that if the total cost of a movie became known, this could undermine the ability of the producer to make a substantial profit on it or could adversely affect audience reaction, because the public tends to believe a movie is worth what it cost to make. Konwiser also explained that industry professionals can figure out how much certain people are being compensated from the overall totals set forth in the Form Z Summary. Konwiser said, "When that trust is violated between us and the State, the trust that we've established within our industry relationships is similarly violated after the fact." Konwiser testified, however, that he has not submitted a Form Z to IDED because neither of his films was completed.

On cross-examination, Konwiser admitted that the budget he submitted to IDED for one of his Iowa movies was artificially low. He wanted the guilds and unions to see a lower budget so they would not seek the premium that is associated with a higher-budget film.

Although Konwiser was the only live witness, the Producers also filed two affidavits—one from Tim Anderson, the president of plaintiff

Mississippi Films, and the other from Isaac Ben-Hamou, the secretary of plaintiff Underground Films. In his affidavit, Anderson stated that he had two film projects registered with IDED in 2009—"Five Step Credit Repair" and "Who's Your Daddy?" In both applications, he formally requested that budget and investor information be kept confidential, "as suggested by IDED." No one from IDED told him the information "would not be kept confidential, and I believed that it would remain confidential." Additionally, Anderson's company had oral agreements with top actors and the director that it would keep salary information confidential. Anderson believed his company would be irreparably harmed by release of the Form Z Summary information because buyers would know the true overall cost of the film and because there is often little or no staff besides the director, so the "Director and Staff" item "essentially reveals the director's salary information."

In his affidavit, Ben-Hamou stated that his company's written agreements with its producer, its director, and one of its actors required confidentiality. These written agreements were included as attachments. Each contained a clause providing that "[a]ll terms and conditions of this agreement are to be confidential with no disclosure and on a non quote basis other than the financier of the picture and completion bond if any is used." According to Ben-Hamou, disclosure of even a Form Z Summary would put Underground Films in breach of those agreements. Ben-Hamou added that "public disclosure of the budget expenditure information would give a competitive advantage to a competing production." No other Producers submitted individualized evidence in support of their claims.

The district court issued its final order on May 19, 2010. The court found the Form Z Summaries constituted confidential trade secrets

under Iowa Code section 22.7(3). The court also concluded that release of these records would "give advantage to competitors and serve no public purpose," thus rendering them confidential under section 22.7(6). Additionally, the district court found the Producers were entitled to relief under section 22.8. As the court put it:

> How can the State of Iowa expect to attract new businesses if the businesses cannot rely on the State's word to keep confidential information which, if released, could harm the businesses? Public curiosity cannot override the public interest in continuing economic development for the State.

The district court's order prohibited IDED from releasing the Form Z Summaries submitted by the Producers. In addition, the court awarded costs and attorneys' fees to the Producers, concluding that

> [a]ttorney fees are recoverable under Iowa Code section 22.10 by a successful private citizen—any private citizen— seeking enforcement of Chapter 22, whether the private citizen seeks to compel disclosure of properly public information or to enjoin disclosure of information properly confidential.

The State appeals.

## II. Standard of Review.

The Producers brought this action seeking injunctive relief and attorneys' fees under chapter 22 of the Iowa Code. Both sides agree that we should apply de novo review. "Cases commenced under Iowa Code chapter 22 are ordinarily triable in equity, thus calling for de novo review on appeal." *Clymer v. City of Cedar Rapids*, 601 N.W.2d 42, 45 (Iowa 1999). We review the district court's interpretation of chapter 22 for correction of errors at law. *Krupp Place 1 Co-op, Inc. v. Bd. of Review*, 801 N.W.2d 9, 13 (Iowa 2011) (citing *Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 890 (Iowa 2009)).

### III. Legal Analysis.[7]

**A. The Basic Statutory Framework.** The Iowa Open Records Act (Iowa Code chapter 22) generally requires state and local entities to make their records available to the public. *See* Iowa Code §§ 22.1(3), .2(1). "The purpose of the statute is 'to open the doors of government to public scrutiny [and] to prevent government from secreting its decision-making activities from the public, on whose behalf it is its duty to act.'" *City of Riverdale v. Diercks*, 806 N.W.2d 643, 652 (Iowa 2011) (quoting *Rathmann v. Bd. of Dirs.*, 580 N.W.2d 773, 777 (Iowa 1998)). We have said the Act establishes "a presumption of openness and disclosure." *Gabrilson v. Flynn*, 554 N.W.2d 267, 271 (Iowa 1996); *see also Hall v. Broadlawns Med. Ctr.,* 811 N.W.2d 478, 485 (Iowa 2012).

However, when this litigation was brought, the Open Records Act was subject to sixty-one disclosure exemptions as set forth in section 22.7. The exemptions include "[t]rade secrets which are recognized and protected as such by law," Iowa Code § 22.7(3), and "[r]eports to governmental agencies which, if released, would give advantage to

---

[7]In this appeal, the State contends that five of the eleven Producers have not yet submitted Form Zs, and therefore, do not have claims that present a ripe controversy. The Producers counter that an actual present controversy exists because all the Producers have actual films that received registration from IDED and all would have to submit a Form Z to receive tax credits offered by the Film Program.

The ripeness doctrine is intended to prevent the courts "'from entangling themselves in abstract disagreements over administrative policies.'" *State v. Tripp*, 776 N.W.2d 855, 859 (Iowa 2010) (quoting *State v. Iowa Dist. Ct.*, 616 N.W.2d 575, 578 (Iowa 2000)). "A case is ripe for adjudication when it presents an actual, present controversy, as opposed to one that is merely hypothetical or speculative." *Id.* (citing *State v. Wade*, 757 N.W.2d 618, 626–27 (Iowa 2008)). Given that some of the Producers unquestionably have fully developed claims, we believe the *controversy* is ripe for adjudication. The State has advanced at most an argument as to why certain Producers may lack *standing*. In any event, the State's specific concern is one of granting relief to parties who "may never complete their film or submit final expenditures to IDED." In light of our disposition of the appeal, we believe that is no longer a concern.

competitors and serve no public purpose," *id.* § 22.7(6). Section 22.7 begins with this sentence:

> The following public records shall be kept confidential, unless otherwise ordered by a court, by the lawful custodian of the records, or by another person duly authorized to release such information.

*Id.* § 22.7.

The next section, section 22.8, gives a court authority to "grant an injunction restraining the examination, including copying, of a specific public record or a narrowly drawn class of public records." *Id.* § 22.8(1). An injunction may be issued only if the court finds both "the examination would clearly not be in the public interest" and "the examination would substantially and irreparably injure any person or persons." *Id.* § 22.8(1)(*a*)–(*b*). The section goes on to state:

> In actions brought under this section the district court shall take into account the policy of this chapter that free and open examination of public records is generally in the public interest even though such examination may cause inconvenience or embarrassment to public officials or others.

*Id.* § 22.8(3).

Section 22.5 confers a general right to injunctive relief. It provides that the provisions of chapter 22 "and all rights of persons under this chapter may be enforced by mandamus or injunction, whether or not any other remedy is also available." *Id.* § 22.5.

Additionally, sections 22.5, 22.8, and 22.10 make clear that judicial review rights under chapter 17A are available to the extent the entity holding the records is covered by that chapter. *See id.* §§ 22.5, .8(4)(*f*), .10(1).

**B. The Parties' Contentions.** In many open records cases, the agency and the party seeking disclosure are at odds because the agency

wants to keep the requested records confidential. *See, e.g., Diercks*, 806 N.W.2d at 645–46; *Gannon v. Bd. of Regents*, 692 N.W.2d 31, 33–34 (Iowa 2005); *Clymer*, 601 N.W.2d at 43–44; *Burton v. Univ. of Iowa Hosps. & Clinics*, 566 N.W.2d 182, 183–85 (Iowa 1997); *DeLaMater v. Marion Civil Serv. Comm'n*, 554 N.W.2d 875, 876–77 (Iowa 1996); *Des Moines Register & Tribune Co. v. Dwyer*, 542 N.W.2d 491, 493 (Iowa 1996); *Hawk Eye v. Jackson*, 521 N.W.2d 750, 751 (Iowa 1994); *Brown v. Iowa Legislative Council*, 490 N.W.2d 551, 552–53 (Iowa 1992); *Des Moines Indep. Cmty. Sch. Dist. Pub. Records v. Des Moines Register & Tribune Co.*, 487 N.W.2d 666, 667–68 (Iowa 1992); *AFSCME/Iowa Council 61 v. Iowa Dep't of Pub. Safety*, 434 N.W.2d 401, 402 (Iowa 1988); *City of Sioux City v. Greater Sioux City Press Club*, 421 N.W.2d 895, 896 (Iowa 1988). Here, however, the State agrees with the Des Moines Register and the other intervenors that the Form Z Summaries should be disclosed. The Producers have gone to court to *prevent* their disclosure.[8]

Below and on appeal, the Producers assert that the Form Z Summaries are shielded from disclosure under section 22.7(3) as "[t]rade secrets which are recognized and protected as such by law," and under section 22.7(6) as "[r]eports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose."[9] The Producers also argue that disclosure of the summaries would "clearly not

---

[8]In the federal vernacular, this would be termed a "reverse-FOIA" or "reverse Freedom of Information Act" suit. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 285, 99 S. Ct. 1705, 1709, 60 L. Ed. 2d 208, 215 (1979).

[9]The Producers also alleged in their petition that disclosure was barred by sections 22.7(8) and 22.7(18). However, they did not submit proposed findings or conclusions on those contentions, the district court did not discuss them in its ruling, and we therefore deem them abandoned. *Weise v. Land O' Lakes Creameries, Inc.*, 191 N.W.2d 619, 621 (Iowa 1971) ("[d]isregarding one division of the [plaintiff's] petition which was abandoned at trial").

be in the public interest" and would "substantially and irreparably injure" a person or persons within the meaning of section 22.8.

The State, by contrast, argues the records do not fall under either section 22.7 exemption. Moreover, the State maintains that even if the records came within one of these exemptions, the "lawful custodian" would still have discretion to order them released under the first sentence of section 22.7, as quoted above. According to the State, a party that wishes to enjoin the release of records by a lawful custodian who intends to release them must meet the requirements of section 22.8. The State further asserts that the requirements for injunctive relief under section 22.8 were not met.

We do not reach the State's argument regarding how the first sentence of section 22.7 should be interpreted. Instead, on our de novo review, we conclude the Producers failed to establish that the Form Z Summaries were confidential under section 22.7(3) or section 22.7(6), *or* that they were entitled to relief under section 22.8.

**C. Applying Section 22.7(3) to This Case.** We first turn to the question of whether the film budget summaries are exempt from disclosure under Iowa Code section 22.7(3) as trade secrets. "Although we should not thwart legislative intent, the specific exemptions contained in freedom of information statutes are to be construed narrowly." *Hall*, 811 N.W.2d at 485.

When applying section 22.7(3), we have previously relied on the definition of "trade secret" found in our Uniform Trade Secrets Act (UTSA). *See, e.g.*, *US W. Commc'ns, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993); *Brown*, 490 N.W.2d at 553–54. This makes sense because the disclosure exemption is for trade secrets

"which are recognized and protected as such by law." *See* Iowa Code § 22.7(3). We will follow the same approach here.

According to Iowa's codification of the UTSA:

> "*Trade secret*" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> *a.* Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> *b.* Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 550.2(4). When the legislature originally enacted its version of the UTSA in 1990, elements (*a*) and (*b*) were disjunctive. The party claiming trade secret status only had to establish one or the other. *See* 1990 Iowa Acts ch. 1201, § 2. In the next session, the legislature revised the definition so that both elements had to be proved. *See* 1991 Iowa Acts ch. 35, § 1.[10] The 1991 amendment conformed Iowa's UTSA to the uniform act on which it was based. *See* Uniform Trade Secrets Act § 1(4), 14 U.L.A. 538 (1979).

The definition of a trade secret under section 550.2(4) is "a mixed question of law and fact." *Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 648 (Iowa 1995). The first part of the definition— " 'information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process' "—is the

---

[10]Iowa's UTSA is based on a model act passed by the National Conference of Commissioners on Uniform State Laws in 1979. All but four states have passed some version of that uniform act. *See* Thomas W. Foley, *Keeping a Company's Confidences Secret: Trade Secret Enforcement Under Iowa's Uniform Trade Secrets Act*, 59 Drake L. Rev. 1, 2 (2010). The four states that have not adopted the uniform act have statutory or common law tests that employ similar standards. *See* Matthew J. Frankel, *Secret Sabermetrics: Trade Secret Protection in the Baseball Analytics Field*, 5 Alb. Gov't L. Rev. 240, 252 (2012).

legal question. *Id.* (quoting Iowa Code § 550.2(4)). The two elements—subsections (*a*) and (*b*) of section 550.2(4)—present questions of fact. *Id.* at 648–49.

"There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret." *US W. Commc'ns*, 498 N.W.2d at 714.

> Business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, *confidential costs*, price data and figures. Trade secrets can range from customer information, to *financial information*, to information about manufacturing processes, to the composition of products.

*Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 776 (Iowa 1999) (emphasis added). We agree with the district court that the investor and budget information submitted in the Form Z Summaries qualifies as "information" under section 550.2(4).

In interpreting their own state freedom of information acts, courts in other jurisdictions have declined to accord exempt "trade secret" status to cost or salary information unless the UTSA requirements have been strictly met. For example, in *Medical Mutual Insurance Co. of Maine v. Bureau of Insurance*, a mutual insurance company was required to disclose information regarding salaries of board members and senior management to the state superintendent of insurance. 866 A.2d 117, 119 (Me. 2005). The company provided the information but asked that it be kept confidential. *Id.* When a policyholder sought the salary information, however, the Maine Supreme Court ruled that the insurance company "failed to demonstrate . . . the salary information had independent economic value from not being generally known and failed to show that it is in fact subject to secrecy." *Id.* at 121; s*ee also Dep't of*

*Pub. Utils. v. Freedom of Info. Comm'n*, 739 A.2d 328, 331–32 (Conn. App. Ct. 1999) (finding a cost allocation study by a public utility did not qualify as a trade secret that was exempt from state FOIA disclosure because the utility had not made reasonable efforts to limit its dissemination); *State ex rel. Toledo Blade Co. v. Ohio Bureau of Workers' Comp.*, 832 N.E.2d 711, 716 (Ohio 2005) (concluding that records showing a state-controlled investment entity's costs of purchasing investment coins were not trade secrets exempt from disclosure under the state's public records act); *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 380 (Ohio 2000) (finding an electronic mail message specifying average nursing salary was not a trade secret exempt from disclosure); *Campbell v. Marion Cnty. Hosp. Dist.*, 580 S.E.2d 163, 167–69 (S.C. Ct. App. 2003) (concluding a county hospital's information relating to physicians' salaries and to purchase price of physician practices did not amount to trade secrets for purposes of state freedom of information act); *Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis.*, 316 N.W.2d 120, 123–24 (Wis. Ct. App. 1981) (denying a power company's request to bar disclosure of bid specifications submitted to the public service commission on the ground that such information constituted trade secrets); *cf. Verizon N.Y., Inc. v. Bradbury*, 837 N.Y.S.2d 291, 294 (App. Div. 2007) (in a non-UTSA state, finding that draft cable franchise agreements submitted to a municipality by Verizon were not trade secrets exempt from disclosure under State Freedom of Information Law where "Verizon failed to establish the specific harm it would suffer").

We have interpreted section 22.7(3) in two prior cases. In *Brown*, a citizen taxpayer of Iowa sought access to computer databases and software used in decennial legislative redistricting. 490 N.W.2d at 552. The databases and software had been provided by an outside vendor,

Election Data Services (EDS), under an agreement with the Iowa Legislative Council. *Id.* The databases and software enabled consideration of the effects of moving geographic units into and out of hypothetical new districts. *Id.* at 552–53. EDS had developed the databases originally from publicly available data, by using what it claimed to be a proprietary process. *Id.* at 553.

Under the UTSA as it existed at the time of trial, the Legislative Council only had to prove the information *either* "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use" *or* "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* at 554 n.2 (internal quotation marks omitted). We found the second alternative had been established. *Id.* at 554. The databases had been encrypted. *Id.* at 553. EDS's contract with Iowa required confidential treatment. *Id.* at 554. EDS had immediately and consistently asserted trade secrecy when the databases and software were requested. *Id.* Also, the "typical" EDS agreement contained a clause under the heading "TRADE SECRETS," which stated:

> It is expressly understood by the parties of this Agreement that the services and information provided by EDS, Inc. under this Agreement are considered a "trade secret", because the services and information are considered proprietary and disclosure of such services and information may cause competitive harm to EDS, Inc.

*Id.* at 554 n.1.

In *US West Communications*, we analyzed the section 22.7(3) trade secret exemption for the first time using the current UTSA definition. 498 N.W.2d at 714. That case arose after a newspaper published a number of articles relating to sales/leasebacks of commercial real estate

by US West and its subsidiaries. *Id.* at 713. According to the articles, US West and its subsidiaries were paying inflated lease rates to each other that were being passed along to increase ratepayers' costs. *Id.*

In a pending rate proceeding, the Office of Consumer Advocate (OCA) filed data requests to obtain information regarding leases and sales of six buildings rented by US West from a subsidiary. *Id.* US West provided the information under a confidentiality agreement, which provided that OCA would not release the information until US West had an opportunity to litigate whether it met an exception to disclosure. *Id.* US West and its subsidiaries then brought an action to enjoin OCA from disclosing the information. *Id.*

We held that the lease/sale information did not qualify for a trade secret exemption under section 22.7(3) because the "independent economic value" element had not been met.[11] *Id.* at 714–15 (citing Iowa Code § 550.2(4)(*a*)). Due to its potential applicability here, our reasoning in that case warrants quotation at some length:

> [US] West contends the data involved has an economic value. It urges that if sale and lease data were disclosed, competitor lessors would undercut its pricing; their lessees would gain an unfair bargaining advantage; and when [US] West was a potential lessee, it would be disadvantaged if lessors knew what it paid elsewhere.
>
> The record made before the trial court is not as clear as these contentions. The information sought involves six buildings located in Colorado and Nebraska. The intervenor's affidavit indicates all six buildings have been sold in the last two years and leased back by [US] West or its affiliates by long-term leases in an effort to protect its stockholders at the ratepayers' expense. While affidavits and testimony by [US] West and its subsidiary employees provide opinions concerning the deleterious effects disclosure will

---

[11]We therefore did not need to consider whether reasonable efforts had been made to maintain secrecy. *See* Iowa Code § 550.2(4)(*b*).

> have on [US] West or its affiliates, such evidence is self-serving and does not contain hard facts.
>
> [US] West provided no evidence concerning the number of tenants in the buildings, the percentage of buildings rented to outsiders, the occupancy rates, or [US] West's own needs concerning leasing space. While reference is made to competitors, the record is vague concerning the extent of the advantage the lease information will provide competitors. We are uncertain whether [US] West or its subsidiaries are major players in the competitive real-estate leasing market or whether most of its leasing is between affiliates. Furthermore, we question the credibility of the expressed concern about competitors and lessees gaining this information. If in fact the sales and leases are in-house transactions between parent and subsidiary companies rather than arms-length transactions, we believe the information would be of little use to [US] West's competitors. The burden was on [US] West and its subsidiaries to prove that a disclosure of the lease and sales information would put [US] West at an economic disadvantage. In our de novo review, we conclude [US] West has failed to meet this burden. Consequently, [US] West failed to establish its entitlement to an exemption pursuant to section 22.7(3).

*Id.* We now consider the section 550.2(4)(*a*) and 550.2(4)(*b*) elements as applied to this case.

1. *Independent economic value.* The economic value inquiry requires us to consider whether the information at issue "protects the owner's competitive edge or advantage." *Id.* at 714. "[I]nformation kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." *Id.* Additionally, the owner must demonstrate the information was "unknown to, and not readily ascertainable by, a person who would profit from [its] disclosure or use." *205 Corp. v. Brandow*, 517 N.W.2d 548, 550 (Iowa 1994).

The Producers articulate essentially two theories of independent economic value. The first theory, discussed by Konwiser in his testimony and Anderson in his affidavit, is that public disclosure of the overall cost of a movie would impair the filmmaker's ability to resell that movie at a

substantial profit. This is a reasonable theoretical argument, but the Producers offered nothing in support of it other than theory. As in *US West Communications*, "hard facts" are missing. 498 N.W.2d at 715. Although the district court afforded the Producers the opportunity to file evidence under seal, the Producers submitted only conclusory statements such as the following paragraph from Anderson's affidavit:

> [R]eleasing this summary information would hurt any chances of making a profit on the film by letting the buyers at the distributing companies know the true and exact cost of making the film. This budget information is not ordinarily available in the film industry when representing a film for sale, and it would be difficult to seek a price of more than cost for the project, inhibiting the ability of the film to secure a profit.

No examples were given. And several points in the record tend to undermine this argument. To begin with, when the district court issued its ruling, the information in the Form Z Summaries at issue was already months to over a year old. No evidence was offered whether any of these summaries involved a film whose owners were actively looking for a distributor. Additionally, Konwiser's testimony painted a picture of a highly competitive distribution market where a few movies are successful and most find no outlet at all. This would suggest that cost is not the driver; rather, if a movie can be predicted to be a success, distributors will compete for it and pay much more than cost. If it looks like a box-office loser, no one will offer to pay even cost. Moreover, Konwiser testified and the record reflected that tax credits are rampant in the industry, so the stated cost of a film (if publicly available) would not reflect true cost. Distributors presumably are aware of these tax credits. Additionally, a number of other producers told IDED they had no objection to the release of their Form Z Summaries. Finally, and perhaps most importantly, there is no dispute that the overall tax credit awarded

by IDED to a specific film is known to the public, and Konwiser testified that based on the Producers' understanding of a fifty percent credit one could double that figure to arrive at the overall production cost.[12]

The second theory, advanced by both affiants and by Konwiser, was that release of the summaries could potentially allow the public to reach a conclusion about the compensation paid to individual actors and directors who had agreed to work only on the condition that their compensation would remain confidential. Anderson claimed he had "verbal agreements" regarding confidentiality; Ben-Hamou filed three written agreements under seal that contained confidentiality provisions. The Form Z Summaries do not disclose individual compensation, only categories such as "DIRECTOR & STAFF" and "TALENT & STAFF." Konwiser, however, testified that there is typically only one director, so "it is easy for someone to assume that all those costs would be attributed to one person."

But again, the Producers' evidence of independent economic value was more theoretical than real. Konwiser was not involved with any of the projects that had submitted a Form Z Summary. Anderson and Ben-Hamou were, but neither of them made any attempt to show how one could derive any actual person's compensation from the Form Z Summaries their companies had submitted. In fact, the record with respect to Ben-Hamou's company, Underground Films, suggests otherwise.[13] On our independent review of the documentary evidence

---

[12]As noted, the State disputes that the tax credit legally should have totaled fifty percent, but the record indicates the Producers and, at least for a time, the Iowa Film Office operated on that basis.

[13]Anderson did not submit any actual copies of agreements on behalf of his company, Mississippi Films.

that was filed under seal, we do not see a discernible way to trace the (partly deferred) compensation that Underground Films agreed to pay the three individuals whose contracts were provided simply by reviewing the company's Form Z Summary. *See US W. Commc'ns*, 498 N.W.2d at 715 (denying relief under section 22.7(3) where "the record is vague concerning the extent of the advantage . . . lease information will provide competitors"); *see also Sun Media Sys., Inc. v. KDSM, LLC*, 564 F. Supp. 2d 946, 965 (S.D. Iowa 2008) (a party seeking to satisfy the burden of proving a trade secret "cannot rely on generic categories or assertions, but rather must assert *specific* allegations that it possessed information that meets the definition of trade secret"). A confidentiality commitment is not enough to establish independent economic value. *See Med. Mut. Ins. Co. of Me.*, 866 A.2d at 121–22 (holding that medical mutual company failed to demonstrate salary information had independent economic value where the only information provided in support of this claim "was a corporate policy that prohibits the corporation from disclosing compensation information"). For the foregoing reasons, we conclude the Producers failed to carry their burden of showing that the information in the Form Z Summaries "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use." *See* Iowa Code § 550.2(4)(*a*).

2. *Reasonable efforts to maintain secrecy.* Furthermore, the Producers have not shown that the information was the subject of reasonable efforts "under the circumstances to maintain its secrecy." *See id.* § 550.2(4)(*b*); *see also Revere Transducers*, 595 N.W.2d at 776.

The key to this test here is found in the statutory phrase "reasonable under the circumstances." *205 Corp.*, 517 N.W.2d at 551.

With regard to the specific Form Z Summaries at issue, the record shows only two possible steps were taken to guard confidentiality. First, all of the Producers requested confidential treatment of the budget, expenditure, and investor portions of their original tax credit applications to IDED. None, however, requested such treatment on the basis that this information was a trade secret protected by section 22.7(3). *Cf. Lockheed Martin IMS Corp. v. State Dep't of Family Assistance*, 681 N.Y.S.2d 656, 658 (App. Div. 1998) (holding that Lockheed Martin waived the right to claim an exemption under state freedom of information law for a contract to develop and operate a centralized system for the collection and disbursement of child support payments where it failed to request and explain the basis for the exemption at the time of submission). Additionally, as we discussed above, Underground Films and Mississippi Films put in evidence that they had written and oral confidentiality agreements respectively with certain individuals associated with their films. This evidence is of limited value because, as we have already noted, it has not been shown disclosure of *the Form Z Summaries* would result in breach of those agreements.

The record does not show that the Producers made reasonable efforts to preserve confidentiality of their financial data as against the outside world in general. There is no evidence that security measures were taken. The Producers failed to show, for instance, that individuals who worked for them and came into contact with this information were required not to disclose it. And the Producers never asserted trade secret status for anything they had submitted to IDED until the present dispute arose. *See Brown*, 490 N.W.2d at 553–54 (finding this element satisfied

where trade secret status was immediately and consistently claimed, all contracts required confidential treatment, and the source codes at issue were encrypted).

For the foregoing reasons, we find, on this record, the Producers have failed to establish that their Form Z Summaries are "[t]rade secrets which are recognized and protected as such by law." Iowa Code § 22.7(3). Our holding is fact specific. We do not foreclose the possibility that on a different record, budget summaries for projects awarded tax credits by the State of Iowa might be considered trade secrets.

**D. Applying Section 22.7(6) to This Case.** The Producers also rely on section 22.7(6), the disclosure exemption for "[r]eports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose."

As we have already explained above, the Producers have failed to come forth with the type of specific, individualized evidence that would allow us to conclude release of the Form Z Summaries would give an advantage to their competitors. Moreover, we agree with the State that release of the Form Z Summaries would serve a legitimate public purpose. "[T]he legislature has drawn th[is] exception to confidentiality narrowly by requiring a showing that no public purpose is served by public disclosure." *Ne. Council on Substance Abuse, Inc. v. Iowa Dep't of Pub. Health*, 513 N.W.2d 757, 761 (Iowa 1994).

In *Northeast Council*, a small nonprofit substance abuse treatment facility (NECSA) received almost three-quarters of its funding from state program grants. *Id.* at 758. NECSA had been the recipient of a department of public health grant for the past twenty years and the only applicant for that grant for the past ten years. *Id.*

Covenant, a private medical center providing similar substance abuse treatment services, planned to apply for the grant funds and asked DPH for NECSA's past grant applications. *Id.* at 759.

> The prior grant applications include[d], among other things, (1) descriptions of the number of people served, (2) the areas served, (3) an analysis of the need for the services in the area to be served, (4) NECSA's philosophy or vision for meeting this need, (5) the allocation of staff hours to various programs and services, (6) staff salaries, (7) the amounts and specific sources of revenue NECSA has received, (8) detailed information about the design and implementation of the various programs and services it offers, (9) a special design of NECSA's functions and how its budgetary lines tie to those functions, and (10) information relating to services and programs addressed in NECSA's current application.

*Id.* NECSA argued that the past grant applications were confidential under section 22.7(6). *Id.* at 760. The district court rejected this argument. *Id.*

On appeal we affirmed. *Id.* at 760–62. In assessing NECSA's claim that the release of the grant applications would "serve no public purpose" within the meaning of section 22.7(6), we noted that $600,000 in public funds were involved. *Id.* at 760. We stated, "Because public funds are involved here, the public has a right to know how those funds have been spent—what services were provided for these funds and how efficiently the funds were spent." *Id.* at 761. We also acknowledged that "[k]nowing what types of salaries are being paid would certainly allow the public to judge for itself whether the salaries are exorbitant." *Id.* Thus, even though Covenant would obtain an economic advantage from release of NECSA's previous grant applications, we read the statute as giving priority to the public purpose served by disclosure. *Id.* at 760–61.

Similar considerations are present here. According to the record, IDED awarded approximately $24 million in tax credits to moviemakers

in fiscal year 2009, a year in which our state government suffered a shortfall in revenues and endured layoffs and furloughs. The public would appear to have an interest in knowing how this money was used. As in the *Northeast Council* case, the requested records would provide more information, albeit in summary form, regarding how public money was spent. *Id.*; *see also Craigmont Care Ctr. v. Dep't of Soc. Servs.*, 325 N.W.2d 918, 920–21 (Iowa Ct. App. 1982) (rejecting a claimed exemption under this section for cost reports filed by various health care facilities after finding that the taxpaying public's strong interest in knowing the cost of care for Medicaid recipients outweighed the potential advantage competitors could gain from access to these reports).

The Producers argue that *Northeast Council* is distinguishable because they are not "spending government grant funds for a government service, but rather are private business entities, producing films and receiving tax credits upon completion as an inducement to engage in their production activities in Iowa." Yet this seems to us a distinction without a difference. Either way, a private entity is receiving taxpayer money in furtherance of a public purpose. In *Northeast Council,* that was the critical consideration. 513 N.W.2d at 761.[14]

The Producers further argue that there is a public "interest in the State honoring its commitments to members of the public." We have previously observed that most courts consider a "pledge of confidentiality [to be a] factor in the balancing process." *City of Dubuque v. Tel. Herald, Inc.*, 297 N.W.2d 523, 528 (Iowa 1980) (finding no pledge of

---

[14]Although nominally the Film Program involves tax credits, in this case the tax credits were transferable, and as a routine matter they were sold to third parties. Thus, they went beyond a reduction or elimination of the Producers' potential tax liability and amounted to State subsidization of filmmaking costs.

confidentiality), *superseded by statute on other grounds,* Iowa Code § 22.7(18) (1985), *as recognized in Greater Sioux City Press Club*, 421 N.W.2d at 897. The State counters that public officials have no right to modify the terms of the Open Records Act by making side agreements.

We need not resolve the debate because the record in this case falls short of a promise of confidentiality. Anderson, the president of Mississippi Films, did not claim in his affidavit he had ever been promised his budget figures would be kept confidential. Nor did Ben-Hamou. Konwiser did volunteer in his live testimony that he had "the absolute assurance from the IDED office . . . that this information would remain confidential." Yet Konwiser provided no specifics, such as person, time, place, or manner, and in any event he was not tied to the Form Z Summaries that were the subject of this litigation.

More to the point, the application made clear that IDED would review the request for confidential treatment and "provide written confirmation to you of its approval or denial." The application also stated, "INFORMATION SUBMITTED WITH THIS APPLICATION MAY BE TREATED AS CONFIDENTIAL IF . . . THE DEPARTMENT ISSUES WRITTEN CONFIRMATION THAT THE INFORMATION . . . WILL BE TREATED AS CONFIDENTIAL." And it stated, "[I]nformation submitted as part of this application information will be available for public inspection, unless a request for confidentiality has been submitted by the applicant in the required form and approved in writing by IDED." None of the Producers claim they received a written confirmation of confidentiality. *See Iowa Movers & Warehousemen's Ass'n v. Briggs*, 237 N.W.2d 759, 766–67 (Iowa 1976) (indicating that reliance on unofficial statements of an agency by substantial businesspersons could not be considered reasonable).

Also, as the State notes, the request for confidential treatment by its terms covered only the application. It did not cover information that might have to be provided later if the application were approved. Once their applications were granted, each Producer signed a contract with IDED that contained the following integration clause:

> This Contract contains the entire understanding between the Recipient and IDED relating to the Registered Project and any representations that may have been made before or after the signing of this Contract, which are not contained herein, are nonbinding, void and of no effect.

IDED's position that any confidentiality shield would not extend to postapplication submissions is plausible. One could reasonably conclude that a high degree of confidentiality protection would be warranted during the application stage, but a lesser degree would be appropriate once the application has been granted and the filmmaker is receiving taxpayer monies.[15]

At the same time, we agree with the State that there is a legitimate public interest in disclosure. The district court found otherwise:

> Although the film program has been a source of controversy, including allegations of fraud and abuse, those matters are not before the Court. This case does not involve issues of whether the program was a good idea in the first place, or whether the program was improperly administered, or whether film producers were misleading or untruthful in their dealings with the IDED. The program was approved by

---

[15]As we have noted, the transferable tax credit involved in this case is the practical equivalent of a government subsidy.

The Producers rely on IDED's admission in its November 20, 2009 letters that it "agreed to maintain the information as confidential as you [i.e., the Producers] requested." The short answer to this argument is that IDED may have *thought* as of November 20 that it made such a commitment, but the record shows it did not. In any event, as we have already discussed, the commitment would not have extended to final budget information submitted after the applications had been approved, the films had been completed, and the tax credit certificates were being requested.

> the legislature and administered by the executive branch of government.
>
>  . . . .
>
>  Release of the Form Z Summaries would serve no public purpose. The public has access to allegations made involving mismanagement, information on how the legislature and IDED set up the program, and information on how much public funding has gone into the program. Fraud or other criminal allegations may lead to other types of disclosures.

We respectfully believe this view of the matter is too narrow. One role of the Open Records Act is to help voters decide whether government programs, even when "approved by the legislature and administered by the executive branch of government," are "a good idea." While the public already has access to information on the total tax credits awarded for particular projects, the Form Z Summaries allow the public to see the expenditures, and thus calculate the public funds being used, for such categories as "DIRECTOR & STAFF," "TALENT & STAFF," "TRAVEL & LIVING," "WARDROBE," AND "MAKEUP & HAIRDRESSING." The public can then assess the appropriateness of these uses of taxpayer funds.

In applying section 22.7(6) "it is not our responsibility to balance competing policy interests. This balancing is a legislative function and our role is simply to determine the legislature's intent about those policy issues." *Ne. Council*, 513 N.W.2d at 761. Under section 22.7(6) the Producers had the burden of demonstrating that no public purpose would be served by the release of the Form Z Summaries. We adhere to our precedent stating that where "public funds are involved . . . the public has a right to know how those funds have been spent . . . and how efficiently the funds were spent." *Id.* Thus, we find the Producers have not carried their burden to establish a section 22.7(6) exemption.

**E. Applying Section 22.8 to This Case.** We now turn to whether the Producers should have been granted relief under section 22.8. As noted above, Iowa Code section 22.8 authorizes a district court to bar disclosure of public records when examination is clearly not in the public interest and "would substantially and irreparably injure any person or persons." Iowa Code § 22.8(1)(*a*)–(*b*). The party opposing disclosure carries the burden of establishing both elements by clear and convincing evidence. *Id.* § 22.8(3); *see also Hall*, 811 N.W.2d at 487. Also, we are required to take into account the policy that "free and open examination of public records is generally in the public interest even though such examination may cause inconvenience or embarrassment to public officials or others." Iowa Code § 22.8(3).

In the past, we have accepted arguments that the public interest under section 22.8 generally encompasses the public's right to know how public money is being spent. For example, in *Northeast Council*, we found the same public interests that overcame a claim of exemption under section 22.7(6) also supported denial of an injunction under section 22.8. 513 N.W.2d at 761; *see also Craigmont Care Ctr.*, 325 N.W.2d at 921 ("We believe that the considerations of public interest discussed in division I are sufficiently strong to render the granting of an injunction under Iowa Code § 68A.8 [now section 22.8] inappropriate.").

More recently, in *Hall*, we reversed a district court's grant of an injunction under section 22.8. 811 N.W.2d at 487–88. In that case, Broadlawns, a publicly funded hospital in Des Moines, came under investigation for alleged deficiencies in its handling of controlled substances. *Id.* During the course of its investigation the board contacted Hall, the licensed pharmacist in charge of the pharmacy at Broadlawns, in order to obtain records from the Broadlawns pharmacy.

*Id.* Hall cooperated with the board's requests and independently decided to conduct an internal audit of Broadlawns, which he also provided to the board. *Id.* About a year later, the board filed charges against Hall and Broadlawns alleging lack of competency and inadequate controls. *Id.* Upon reviewing the statement of charges, which referenced the internal audit conducted by Hall, the Des Moines Register sought to obtain Hall's audit under the Open Records Act. *Id.* Broadlawns refused to release the audit claiming it was confidential, and in order to prevent disclosure, Hall filed an action against Broadlawns seeking declaratory and injunctive relief precluding release of the internal audit. *Id.* The Register intervened. *Id.* The district court granted an injunction against disclosure, and the Register appealed. *Id.*

On appeal, Hall and Broadlawns argued that under section 22.8, release of the audit would clearly not be in the public interest because it would have a "chilling effect" on candid communications within the pharmacy and with the board. *Id.* at 488. Hall further argued that if the audit was released to a news publisher, the board would be improperly swayed in disciplinary proceedings against him. *Id.*

Regarding section 22.8, we concluded Hall had failed to demonstrate release of the audit would clearly not be in the public interest. *Id.* at 487–88. In reaching this conclusion, we observed that "[t]he public interest in information related to the theft of drugs from a pharmacy at a hospital funded by taxpayers is compelling." *Id.* at 487. We also noted that the information sought "merely present[ed] factual information in a table format related to drug inventories" and did "not contain communications reflecting deliberative processes, [did] not make policy recommendations of any kind, and [did] not implicate privacy interests of third parties." *Id.* at 488. As to Hall's argument that release

of the documents to the media would result in the board being improperly swayed in the disciplinary proceeding, we decided that this claim was "too speculative and too insubstantial." *Id.*

This case involves some of the same elements as *Hall*. Like the Broadlawns pharmacy, the Iowa Film Program has become the subject of public controversy and accusations of criminal conduct. Millions of dollars are involved. Because release of the Form Z Summaries would serve a legitimate public purpose, we conclude the Producers were not entitled to an injunction under section 22.8.[16]

We also believe the Producers failed to demonstrate substantial and irreparable injury to a person or persons. *See* Iowa Code § 22.8(1)(*b*). The Producers asserted three types of harm. First, they alleged a Producer's ability to market a film at a profit could be affected if an outsider knew the Producer's overall costs. Second, they expressed concern that directors, actors, and others would have less ability to negotiate higher compensation in the future if third parties could determine how much they had worked for by drawing inferences from a Form Z Summary. Third, they alleged disclosure of the summaries would result in a breach of trust and that trust, once lost, would not be recovered.

We have already discussed the first two alleged harms in regard to section 22.7(3). Regarding the first type of harm, a critical link is

---

[16]The Producers argue that Iowa Code section 15.118, a confidentiality law that specifically governs IDED, "demonstrates the public commitment to providing a mechanism for maintaining the confidentiality of business information in the administration of tax credits in order to encourage businesses to come to the State of Iowa and increase Iowa's economic development." However, the Producers do not argue that section 15.118 literally applies to the Form Z Summaries. We do not believe the mere existence of a confidentiality law governing other materials is sufficient to alter the conclusion we have reached regarding the public interest in this case. *Cf. Burton*, 566 N.W.2d at 189 (holding that "chapter 22 does not trump or supersede specific statutes . . . on confidentiality of records").

missing from the Producers' chain of reasoning. As we have noted, since the total tax credits awarded for any given film project are disclosed publicly, and the Producers claimed they were entitled to fifty percent credits, an interested person already can ascertain approximately what the film cost. This record falls well short of establishing that a Producer would be irreparably harmed if a two-page summary of its expenditures on a film were disclosed. To the extent the Producers are concerned about the disclosure of cost data benefiting a competitor, these are the same concerns that did not carry the day in *Northeast Council* and *Craigmont Care Center*. *See Ne. Council*, 513 N.W.2d at 760–62; *Craigmont Care Ctr.*, 325 N.W.2d at 920–21.

As to the second alleged harm, the Producers have raised a hypothetical concern that from a category like "Director and Staff," it might be possible for an outside party to figure out how much the director was actually paid on a film. The argument continues that this would make it harder for that person to seek higher compensation on a different project. As we have already discussed, this argument was presented entirely at an abstract level. No example was given of how the calculation could actually be made using one of the Form Z Summaries at issue, even though the district court permitted confidential submissions. Nor did any director, actor, or other individual whose compensation would allegedly be subject to disclosure actually file an affidavit expressing this concern. A number of filmmakers expressed willingness to have their Form Z Summaries released.

The final alleged injury cited by the Producers really involves alleged harm to the State. As the district court put it, "How can the State of Iowa expect to attract new businesses if the businesses cannot rely on the State's word to keep confidential information which, if released, could

harm the businesses?" We respectfully disagree with the district court. To begin with, its conclusion is based on factual premises we do not share. As discussed above, IDED did not promise to keep the Form Z Summaries confidential, and the Producers have not shown release of those summaries would hurt them financially. Furthermore, we do not see section 22.8 as a device for protecting the government from itself. The irreparable harm must be to some person or entity other than the defendant that is resisting the injunction. *See* Iowa Code § 22.8(1)(*b*).

## IV. Disposition.

Because of our disposition of this appeal, we need not reach the State's arguments concerning the award of attorneys' fees to the Producers. For the reasons set forth above, we reverse the district court's judgment in favor of the Producers and remand this case for further proceedings consistent herewith.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Zager, J., who takes no part.